## UNITED STATES DISTRICT COURT
## THE EASTERN DISTRICT OF NEW YORK

THORNBURG MORTGAGE HOME
LOANS, INC.,

Plaintiffs,

v.

WALL STREET MORTGAGE
BANKERS LTD. D/B/A POWER
EXPRESS,

Defendant.

Civ. A. No.

DEARIE, CH. J.

**COMPLAINT**

POLLAK, M.J

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JUL 0 8 2008

BROOKLYN OFFICE

Plaintiff Thornburg Mortgage Home Loans, Inc. ("TMHL"), by way of Complaint

against defendant Wall Street Mortgage Bankers Ltd. d/b/a Power Express ("Wall Street") states

as follows:

### THE PARTIES

1.      TMHL is a Delaware Corporation with its principal place of business

located at 150 Washington Street, Suite 302, Santa Fe, New Mexico.  TMHL is in the business

of, among other things, originating, purchasing and servicing residential mortgage loans.

2.      Wall Street is a New York Corporation with its principal place of business

located at 1111A Marcus Avenue, Lake Success, New York.  Wall Street, among other things,

originates residential mortgage loans and then sells them in the secondary market to TMHL

pursuant to a Correspondent Sellers Guide and a Correspondent Loan Purchase Agreement.

### JURISDICTION

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §

1332(a) (2) because this is an action between a Delaware corporation and a New York

corporation, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over Wall Street by way of, among other things, Section 11(c) of the Correspondent Loan Purchase Agreement at issue in this litigation.  Under Section 11(c) of the agreement, Wall Street consented to the jurisdiction of any Federal or State court located in the State of New York.

## VENUE

5.      Venue in this Court is proper under 28 U.S.C. § 1391(a)(1) and (2) and/or 28 U.S.C. § 1391 (c) in that Wall Street maintains a principal place of business that is located in the Eastern District of New York and a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of New York.

6.      Venue also is proper in the Eastern District of New York by way of Section 11(c) of the Correspondent Loan Purchase Agreement at issue in this litigation.  Through this paragraph, Wall Street consented to the venue of any Federal or State court located in the State of New York.

7.      Venue also is proper because Wall Street is subject to personal jurisdiction in the Eastern District of New York.

## FACTS

### The Correspondent Sellers Guide and
### The Correspondent Loan Purchase Agreement

8.      A Correspondent Sellers Guide (the "Guide") applies to all loans that TMHL purchases from its Correspondent loan originators.  The Guide, among other things, (a) sets forth the criteria for loans that TMHL will purchase, (b) outlines certain representations and warranties for the loans that Correspondents sell to TMHL, and (c) outlines the remedies available to TMHL if the representations and warranties are breached.

9.      Under Section 8.1 of the Guide a "Correspondent" is defined as the "seller of an Eligible Loan to TMHL pursuant to the terms of the Correspondent Loan Purchase Agreement and this Correspondent Sellers Guide."

10.      At all relevant times, Wall Street was a Correspondent for TMHL as defined in the Guide.

11.      On June 13, 2001, Wall Street and TMHL entered into a Correspondent Loan Purchase Agreement (the "Agreement"). Attached as Exhibit A is a true and accurate copy of the Agreement.

12.      Under the terms of the Agreement, TMHL agreed to purchase from Wall Street, and Wall Street agreed to sell to TMHL, certain residential mortgage loans that Wall Street originated.

13.      The Agreement expressly incorporates the terms of the Guide. Attached as Exhibit B are relevant portions of the Guide.

14.      A loan that fits within the criteria set forth within the Guide is defined as an "Eligible Loan" under the Agreement.

15.      Under Section 3 of the Agreement, if a mortgage loan fits within the criteria in the Guide, Wall Street may "sell, transfer, assign, set over and convey to TMHL, without recourse, but subject to the terms and provisions of this Agreement, all the right, title and interest of [Wall Street] in and to one or more Eligible Loans."

16.      As consideration for the sale, transfer or assignment of Eligible Loans, TMHL will pay Wall Street a purchase price agreed to by the parties.

17.      Under Section 3(f) of the Agreement, the parties agreed to a first payment default provision which states:

In the event any borrower defaults on the payment of the first payment due on an Eligible Loan, [Wall Street] shall repurchase such Eligible Loan from TMHL, at TMHL's sole option, pursuant to the Guide.

18.     The Agreement also contains certain representations and warranties (including representations and warranties contained in the Guide, which are expressly incorporated into the Agreement) that Wall Street made to TMHL with respect to the Eligible Loans TMHL purchased.

19.     Under the Section 5(b) of the Agreement, each of the representations and warranties listed in the Agreement and Guide were granted to TMHL "without regard to [Wall Street's] actual or implied knowledge of the untruth" of the representation or warranty.

20.     Among other things, Wall Street represented and warranted the following with respect to the loans it sold to TMHL:

a.     that the mortgage with respect to any mortgage loan sold is valid, subsisting, and an enforceable first priority lien;

b.     that the mortgaged property is owned by the mortgagor in fee simple;

c.     that there was no default, breach, violation, or event of acceleration existing under any mortgage note or related mortgage assigned;

d.     that a title insurance policy for the loan was issued and ensures a first priority lien on the Property; and

e.     that there has been no fraud, dishonesty, misrepresentation, error, omission, negligence or similar occurrence with respect to the mortgage loan.

21.     Section 6.2 of the Guide provides that "upon discovery by the Correspondent or TMHL" of a breach of any representations and warranties, including the no fraud representation and fraud warranty, "the discovering party shall give prompt written notice to the others" of the breach or defect.

22.     In addition, Section 6.2 of the Guide requires Wall Street to "use its best efforts to promptly cure in all material respects any such breach or defect within sixty (60) days of the earlier of either discovery by or notice to the Correspondent of such breach or defect."

23.     Section 6.2 of the Guide further provides that if the defect cannot be cured and it is a breach of Section 6 of the Guide, Correspondent is required to repurchase either "(1) all of the Eligible Loans or (2) such of the Eligible Loans selected by TMHL so that, after such repurchase, such breach or defect is cured in all material respects."

24.     Section 6.2 of the Guide, further recognizes that the Correspondent has an obligation to "indemnify and hold harmless TMHL against any losses, damages, penalties, fines, forfeitures, reasonable legal fees, and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense, or assertion based on or grounded upon, or resulting from a breach of the Correspondent's representations and warranties contained in this Correspondent Sellers Guide or the Correspondent Loan Purchase Agreement."

25.     The rights outlined in Section 6.2 of the Guide are echoed in Section 5 of the Agreement, which states, among other things, that TMHL has the express right to demand that Wall Street repurchase an Eligible Loan from TMHL if any of the representations and/or warranties that Wall Street made with respect to the Eligible Loans is determined to be untrue.

26.     Section 5(b) of the Agreement recognizes that TMHL can invoke the repurchase right even if Wall Street has no knowledge of the false nature of the representations or warranties.

27.     Section 5(c) of the Agreement recognizes that Wall Street has an obligation to indemnify and hold TMHL harmless for any damages or losses sustained by a breach of a representation and warranty.

28.     Under Section 11(b) of the Agreement, Wall Street and TMHL agreed that all disputes related to the Agreement would be governed by New York law.

29.     Under Section 11(c) of the Agreement, Wall Street and TMHL agreed that jurisdiction and venue for any dispute arising under the Agreement will lie in any "Federal Court or State Court located in the State of New York."

30.     Under Section 11(k) of the Agreement, Wall Street and TMHL further agreed that the prevailing party in any litigation involving the Agreement is entitled to recover attorney's fees and costs of the litigation.

## The Loan

31.     On or about February 28, 2007, Adriana Diaz ("Diaz") allegedly purchased from Codan LLC, a property located at 1331 Brickell Bay Drive, Unit 3605, Miami, Florida (the "Property").

32.     In order to fund the purchase of the Property, Diaz obtained two residential mortgage loans from Wall Street. The first loan was in the amount of One Million Seven Hundred Twenty-Five Thousand Dollars ($1,725,000.00) (the "First Mortgage Loan"). The second loan was in the amount of One Hundred Fifteen Thousand Dollars ($115,000.00) (the "Second Mortgage Loan").

33.     Wall Street was the loan originator of both the loans that Diaz obtained to fund the purchase of the Property.

34.     On or about March 22, 2007, TMHL purchased the First Mortgage Loan from Wall Street for the sum of One Million Seven Hundred Sixty-Eight Thousand Four Hundred Seventy Dollars ($1,768,470.00).

35.     Wall Street represented and warranted to TMHL that the First Mortgage Loan was an "Eligible Loan" as defined under the Guide.

36.     In reliance on the representations and warranties outlined in the Guide, TMHL paid Wall Street a premium of Forty Three Thousand Four Hundred Seventy Dollars ($43,470.00) over the principal amount of the First Mortgage Loan.

37.     As part of the loan documentation for the First Mortgage Loan, Wall Street had Diaz execute, among other things, a promissory note to evidence the amount of the First Mortgage Loan, and a mortgage on the Property to secure the amount due under the First Mortgage Loan.

38.     Wall Street also had two Uniform Residential Appraisal Reports prepared for the Property which outlined the sales history of the Property and established the fair market value for the Property at Two Million Three Hundred Thousand Dollars ($2,300,000.00).

39.     Upon information and belief the Uniform Residential Appraisal Reports that were prepared for Wall Street used improper comparables and overvalued the Property by approximately Seven Hundred Thousand Dollars ($700,000.00).

40.     Following the sale of the First Mortgage Loan from Wall Street to TMHL, on June 1, 2007, TMHL wrote to Wall Street to advise it that the first payment due under the

promissory note was not paid in violation of Section 3(f) of the Agreement.  A true an accurate copy of TMHL's June 1, 2007 letter is attached as Exhibit C.

      41.    As a result of this first payment default, TMHL demanded that Wall Street repurchase the First Mortgage Loan by July 2, 2007.

      42.    Wall Street never responded to TMHL's July 2, 2007 letter.

      43.    On July 3, 2007, TMHL made a second request for Wall Street to repurchase the First Mortgage Loan for the amount of One Million Seven Hundred Ninety Six Thousand Eighty Three Dollars and 99/100 ($1,796,083.99).  A true an accurate copy of TMHL's July 3, 2007 letter is attached as Exhibit D.

      44.    Wall Street failed and refused to repurchase the First Mortgage Loan.

      45.    In or around July 2007, Wall Street discovered that the First Mortgage Loan did not comply with all the laws and regulations relating to residential mortgage loans. Among other things, the Closing Agent that oversaw the closing on the First Mortgage Loan never recorded the deed evidencing the transfer of title of the Property from Codan LLC to Diaz. The Closing Agent also disbursed the loan proceeds without obtaining a signature on the HUD-1 closing statement as is customary industry practice.

      46.    It also was discovered that in or about June 2007, the original seller of the Property, Codan LLC, transferred title to the Property to a third party.  This sale occurred because a Deed to the Diaz/Codan transaction was never recorded and the loan proceeds that were supposed to fund the purchase of the Property were misappropriated and, upon information and belief, never received by Codan.

47.     In response to these discoveries, Wall Street filed a claim with Attorneys' Title Insurance Fund, Inc. ("ATIF"), the entity that issued a closing protection letter and Title Insurance Commitment Form with respect to the First Mortgage Loan.

48.     Thereafter, between July 2007 and June 2008, Wall Street attempted to negotiate a settlement of the claim with ATIF.

49.     ATIF refused to pay Wall Street for the losses incurred with respect to the First and Second Mortgage Loans.

50.     Consequently, on or about June 10, 2008, Wall Street instituted suit in the Southern District of Florida against ATIF for breach of fiduciary duty, negligence, conversion, breach of contract and a declaratory judgment with respect to losses Wall Street claims it incurred with respect to the First and Second Mortgage Loans.

51.     In the suit Wall Street claimed that ATIF was liable to it for breach of fiduciary duty and negligence resulting from the mishandling of the First Mortgage Loan and the Second Mortgage Loan by the closing agent that ATIF selected to oversee the closing.  Among other things Wall Street claims ATIF was liable for breach of fiduciary duty and negligence associated with the closing agent's failure to obtain a signed HUD-1 Closing Statement and a duly executed Deed before disbursing the loan proceeds.

52.     Once it was apparent that Wall Street was not going to be able to amicably resolve its issues with ATIF, on June 9, 2008, TMHL's counsel sent a final demand letter for Wall Street to repurchase the First Mortgage Loan as it was required to do under the Agreement and the Guide.  A true and accurate copy of TMHL's June 9, 2008 letter is attached as Exhibit E.

53.     In the June 9, 2008 letter TMHL advised Wall Street that it was in breach of, among other things, the following express representations and warranties contained in the Guide:

a.      The representation found in Section 6.1(a)(3) of the Guide that the mortgage is valid, subsisting, and an enforceable first priority lien and the mortgaged property is owned by the mortgagor in fee simple;

b.      The representation found in Section 6.1(a)(6) of the Guide that there was no default, breach, violation, or event of acceleration existing under the mortgage note or related mortgage;

c.      The representation found in Section 6.1(a)(18) of the Guide that warrants that the title insurance policy ensures a first priority lien of the mortgage; and

d.      The representation found in Section 6.1(a)(38) of the Guide that warrants that there has been no fraud, dishonesty, misrepresentation, error, omission, negligence or similar occurrence with respect to the mortgage loan.

54.     The June 9, 2008 letter gave Wall Street until July 3, 2008 to repurchase the First Mortgage Loan for the sum of One Million Eight Hundred Fifty-One Thousand, Nine Hundred Fifty-Two and 82/100 Dollars ($1,851,952.82), representing the outstanding amount of principal, interest and attorney's fees due under the First Mortgage Loan.

55.     In response to TMHL's letter, Wall Street failed and refused to repurchase the First Mortgage Loan.

56.     As a result of Wall Street's breach of the representations and warranties outlined in the Guide and the Agreement and its failure to repurchase the First Mortgage Loan, TMHL has sustained losses as of July 3, 2007 that currently total $1,849,869.32, plus attorney's fees and costs and other fees and costs of pursuing this litigation.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

57.     TMHL re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

58.     Wall Street and TMHL entered into the valid and enforceable Agreement on June 13, 2001, whereby Wall Street agreed to sell certain Eligible Loans to TMHL for consideration.

59.     Wall Street breached Sections 3(f) of the Agreement and Section 6.2 of the Guide by failing and refusing to repurchase the First Mortgage Loan after Diaz defaulted on the first payment due and owing under the promissory note.

60.     Wall Street also breached Section 6.2 of the Guide and Section 5(c) of the Agreement by failing to cure the breach of the representations and warranties found in Sections 6.1(a)(3), (6), (18) and (38) of the Guide, and by failing and refusing to repurchase the First Mortgage Loan in the event it was unable to cure the breaches.

61.     Wall Street further breached Section 6.2 of the Guide by failing and refusing to indemnify and hold TMHL harmless for losses TMHL sustained from the First Mortgage Loan.

62.     As a result of Wall Street's breach, TMHL has and continues to suffer damages.

WHEREFORE, TMHL respectfully request that the Court grant it the following relief:

a.    entry of judgment against Wall Street awarding TMHL

compensatory damages in an amount to be determined at trial;

b.    entry of judgment against Wall Street awarding TMHL reasonable

attorney's fees, costs and interest as provided under Section 11(k)

of the Agreement; and

c.    entry of judgment against Wall Street awarding TMHL such other

and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

63.    TMHL re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

64.    The Agreement contained an implied covenant of good faith and fair dealing that required Wall Street to act in good faith with respect to the origination of Eligible Loans it sold to TMHL.

65.    Upon information and belief, Wall Street breached the implied covenant of good faith and fair dealing by, among other things, failing to properly oversee the closing of the First Mortgage Loan, failing to confirm that the loan documentation was in order prior to selling the First Mortgage Loan to TMHL (including failing to insure that a deed was recorded and a title insurance policy issued), failing to timely advise TMHL of its belief that the First Mortgage Loan was procured by fraud, and failing and refusing to cure the breaches of the Guide and Agreement in a timely manner.

66.    As a result of Wall Street's breach of the implied covenant of good faith and fair dealing, TMHL has suffered and continues to suffer damages.

WHEREFORE, TMHL respectfully request that the Court grant it the following relief:

      a.      entry of judgment against Wall Street awarding TMHL compensatory damages in an amount to be determined at trial;

      b.      entry of judgment against Wall Street awarding TMHL reasonable attorney's fees, costs and interest as provided under Section 11(k) of the Agreement; and

      c.      entry of judgment against Wall Street awarding TMHL such other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION – UNJUST ENRICHMENT

67.      TMHL re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

68.      At all times relevant hereto, TMHL conferred a benefit upon Wall Street by paying Wall Street the sum of One Million Seven Hundred Sixty-Eight Thousand Four Hundred Seventy Dollars ($1,768,470.00) for the First Mortgage Loan.

69.      At all times relevant hereto, Wall Street accepted and retained, without objection, the benefit of TMHL's payment for the First Mortgage Loan.

70.      At all times relevant hereto, Wall Street was aware of TMHL's reasonable expectation that Wall Street would provide TMHL with the benefit of an Eligible Loan that fit within the criteria outlined in the Guide as consideration for the payment that TMHL made for the First Mortgage Loan.

71.      Wall Street, however, never provided TMHL with the benefit of an Eligible Loan that fit within the criteria outlined in the Guide.

72.     As a direct and proximate result of Wall Street's acceptance of the benefit that TMHL conferred, Wall Street has been unjustly enriched at TMHL's expense.

WHEREFORE, TMHL respectfully request that the Court grant it the following relief:

a.     entry of judgment against Wall Street awarding TMHL compensatory damages in an amount to be determined at trial;

b.     entry of judgment against Wall Street awarding TMHL reasonable attorney's fees, costs and interest as provided under Section 11(k) of the Agreement; and

c.     entry of judgment against Wall Street awarding TMHL such other and further relief as this Court deems just and proper.

**FOURTH CAUSE OF ACTION – PROMISSORY ESTOPPEL**

73.     TMHL re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

74.     At various times representatives of Wall Street promised TMHL that Wall Street would provide TMHL with an Eligible Loan in exchange for TMHL paying Wall Street the sum of One Million Seven Hundred Sixty-Eight Thousand Four Hundred Seventy Dollars ($1,768,470.00).

75.     At various times representatives of Wall Street also promised TMHL that Wall Street would repurchase the First Mortgage Loan if it was discovered that the loan did not fit within the criteria of an Eligible Loan as outlined in the Guide.

76.     Wall Street also represented that it would indemnify and hold TMHL harmless for all losses associated with loans that did not fit within the criteria of an Eligible Loan as outlined in the Guide.

77.     Wall Street's representatives made these promises on behalf of Wall Street with the expectation that TMHL would rely upon them and pay Wall Street the sum of One Million Seven Hundred Sixty-Eight Thousand Four Hundred Seventy Dollars ($1,768,470.00).

78.     TMHL reasonably relied upon Wall Street's promises, and paid Wall Street the sum of One Million Seven Hundred Sixty-Eight Thousand Four Hundred Seventy Dollars ($1,768,470.00).

79.     Wall Street, however, never fully fulfilled its promises to provide TMHL with an Eligible Loan and/or to repurchase the First Mortgage Loan once it was discovered that the loan did not fit within the criteria of an Eligible Loan.

80.     Wall Street also failed to fulfill its promise to indemnify and hold TMHL harmless for losses sustained from loans that did not fit within the criteria of an Eligible Loan as outlined in the Guide.

81.     As a proximate result of TMHL's reasonable reliance on Wall Street's promises, TMHL has suffered damages.

WHEREFORE, TMHL respectfully requests that the Court grant it the following relief:

   a.     entry of judgment against Wall Street awarding TMHL compensatory damages in an amount to be determined at trial;

   b.     entry of judgment against Wall Street awarding TMHL reasonable attorney's fees, costs and interest as provided under Section 11(k) of the Agreement; and

   c.     entry of judgment against Wall Street awarding TMHL such other and further relief as this Court deems just and proper.

Dated:  July 8, 2008

Suzanne M. D'Amico [SD 3581]
PEPPER HAMILTON LLP
The New York Times Building
37th Floor
620 Eighth Avenue
New York, NY 10018-1405
PH:  212-808-2700
FAX:  212-286-9806

and

Angelo A. Stio III [AS 7880]
PEPPER HAMILTON LLP
Suite 400
301 Carnegie Center
Princeton, NJ 08543-5276
PH: 609.452.0808
FAX: 609.452.1147

Attorneys for Plaintiff Thornburg Mortgage Home
Loans, Inc.

# THORNBURG MORTGAGE HOME LOANS, INC.

---

## CORRESPONDENT LOAN

## PURCHASE AGREEMENT

## (SERVICING RELEASED LOANS)



This CORRESPONDENT LOAN PURCHASE AGREEMENT (this "Agreement") dated as of __13 of June, 2001__ is between THORNBURG MORTGAGE HOME LOANS, INC., a Delaware corporation ("TMHL"), and the seller named below (the "Correspondent").

PRELIMINARY STATEMENT

WHEREAS, in reliance upon the representations and warranties of the Correspondent contained herein, and the Correspondent Seller Guide ("Guide"), as hereinafter defined, which are incorporated by reference herein, and in the Correspondent Application attached hereto as Exhibit A, TMHL has agreed to purchase from the Correspondent, from time to time, and the Correspondent has agreed to sell to TMHL, from time to time, on a servicing released basis, certain residential whole mortgage loans meeting the criteria set forth in the Correspondent Seller Guide;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, TMHL and the Correspondent agree as follows:

Section 1.    __Definitions.__   Unless otherwise defined herein, the capitalized terms used herein shall have the meanings set forth in the Correspondent Seller Guide.

Section 2.    __Delivery of the Guide.__    TMHL has provided to the Correspondent and the Correspondent has received and reviewed the Guide, which is incorporated by reference in its entirety into this Agreement. The Correspondent has had the opportunity to ask questions of TMHL concerning the Guide. The Correspondent understands and agrees that TMHL's interpretation of the Guide, as applicable, shall be final and binding on the Correspondent in all respects.

Section 3.    __Sale and Conveyance of Eligible Loans; Possession of Mortgage Files.__

(a)    Regarding the purchase of each Eligible Loan or Eligible Loans, Correspondent agrees to provide TMHL with its wire transfer instructions.  TMHL shall issue a Verification of Purchase and Wire Transfer by facsimile to Correspondent following such purchase(s).

(b)    On each Purchase Date, the Correspondent, upon the receipt of the Purchase Price therefor, does hereby sell, transfer, assign, set over and convey to TMHL, without recourse, but subject to the terms and provisions of this Agreement, all the right, title, and interest of the Correspondent in and to one or more Eligible Loans meeting the requirements of this Agreement. In full consideration for the sale of each of the Eligible Loans by the Correspondent to TMHL pursuant to this Agreement, on each Purchase Date TMHL shall pay to the Correspondent the Purchase Price, as adjusted as set forth in the Guide, for the Eligible Loans purchased on such Purchase Date.

(c)     The Correspondent will deliver the following items to TMHL on the Effective Date:

(i)     an executed original of this Agreement;

(ii)    the Officers' Certificate, substantially in the form of Exhibit B.

(iii)   the Opinion of Counsel, substantially in the form of Exhibit C. which shall be acceptable to TMHL in its sole discretion;

(iv)    a certificate or other evidence of merger or change of name, signed or stamped by the applicable regulatory authority, if any of the Eligible Loans which were acquired through merger or originated by the Correspondent while conducting business under a name other than its present name;

(v)     the written approval of any receiver, conservator or trustee that is (or may be) necessary for consummation of the transactions contemplated by this Agreement, which written approval shall be dated no more that twenty (20) days prior to the Effective Date; and

(vi)    any consents or approvals required by any and all applicable laws, rules or regulations or pursuant to contract to consummate the transactions contemplated hereby.

(d)     Upon payment for the related Eligible Loan pursuant to this Section 3, the beneficial ownership of each Mortgage Note, each Mortgage, and each of the other documents comprising the Mortgage File with respect to each Eligible Loan is hereby vested in TMHL, and the ownership of all records and documents with respect to each Eligible Loan prepared by or which come into the possession of the Correspondent is hereby immediately vested in TMHL, and the contents of the Mortgage File and any other records and documents, except for any documents delivered to TMHL's custodian, shall immediately be delivered to Cenlar FSB, subservicer for TMHL, or to any other party designated by TMHL from time to time.

(e)     In the event an Eligible Loan purchased by TMHL is prepaid in full by a borrower within one hundred twenty (120) days of the purchase of the Eligible Loan by TMHL, Correspondent shall repurchase such Eligible Loan from TMHL pursuant to the Guide and, in addition, shall pay TMHL the premium, if any, (including any premium for servicing released) paid by TMHL to Correspondent for the Eligible Loan.

(f)     In the event any borrower defaults on the payment of the first payment due on an Eligible Loan, Correspondent shall repurchase such Eligible Loan from TMHL, at TMHL's sole option, pursuant to the Seller Guide.

Section 4.     **Application and Amendment of the Guide.**

The interpretation by TMHL of the Guide shall be final and binding on the parties hereto in all respects. Regardless of whether specifically identified as such, each requirement, standard, instruction or statement in the Guide, the Correspondent Application and this Agreement shall be deemed to be a representation and warranty by Correspondent to TMHL. TMHL may amend, alter, modify, supplement, replace or restate the Guide (an "Amendment") at any time, and from time to time, in its sole discretion without the consent of the Correspondent. TMHL shall give written notice of an Amendment to the Correspondent, and the Amendment shall become effective immediately or as specifically provided therein. In the event of any inconsistencies between the provisions of this Agreement and the Guide, this Agreement shall control.

Section 5.     Representations, Warranties and Covenants of the Correspondent Remedy.

(a)     The Correspondent hereby makes to TMHL as of the Effective Date all of the Correspondent's representations, and warranties set forth in the Guide and grants to TMHL the remedies set forth hereunder and in the Guide with respect to a breach of such representations and warranties. The Correspondent also hereby covenants with TMHL that the Correspondent shall continue to comply with all of the Correspondent's representations, warranties and covenants set forth in the Guide and this Agreement. The warranties, obligations and representations stated in the Guide are hereby made or undertaken by Correspondent with respect to each of the Eligible Loans to be sold and serviced by it on behalf of TMHL, unless expressly waived in writing by TMHL. All warranties made by Correspondent shall survive (i) any investigation made by or on behalf of TMHL, its assignee or designee, (ii) liquidation of the Eligible Loan, (iii) purchase of the Eligible Loan by TMHL, its designee or assignee, (iv) repurchase of the Eligible Loan by Correspondent, and (v) termination of this Agreement or similar event, and all such warranties shall inure to the benefit of TMHL. Correspondent shall supply evidence that is satisfactory to TMHL of its compliance with any provisions of the Guide.

(b)     If, after purchase of any Eligible Loan by TMHL, any of the representations or warranties of the Correspondent contained herein or in the Guide are untrue, TMHL may, at its option, without regard to the Correspondent's actual or implied knowledge of the untruth of such warranty (except to the extent the warranty is expressly conditioned upon the Correspondent's actual knowledge), in addition to and without limitation as to any other remedy accruing to TMHL, require the Correspondent to repurchase said Eligible Loan pursuant to the Guide. It is contemplated that a third party may purchase from TMHL the Eligible Loans purchased by TMHL from Correspondent, and Correspondent agrees that TMHL may, in its own name or in the name of the third party, exercise any rights or remedies at law or in equity on behalf of itself or such third party.

(c)     Correspondent shall indemnify TMHL from and hold TMHL harmless against all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgements, and any other costs, fees, and expenses heretofore or hereafter resulting from a material breach of

any warranty, obligation or representation contained in or made pursuant to this Agreement or from any claim, demand, defense or assertion against or involving TMHL, or its assignee or transferee of any Eligible Loan based on or grounded upon, or resulting from such breach or a breach of any representation, warranty or obligation made by TMHL in reliance upon any warranty, obligation or representation made by Correspondent contained in or made pursuant to this Agreement. Correspondent hereby acknowledges TMHL's intent to sell the Eligible Loans to third parties in reliance upon Correspondent's warranties, obligations and representations. The obligations of Correspondent under this Section shall survive delivery and payment for the Eligible Loans, liquidation or repurchase of the Eligible Loans and termination of this Agreement or the expiration hereof.

Section 6.    <u>Correspondent's Duties</u>

Correspondent shall diligently perform all duties incident to the selling of all Eligible Loans which may be sold by Correspondent, from time to time. In the performance of such duties, Correspondent shall employ procedures and exercise the same care that it would maintain for loans held in its own portfolio and in accordance with standards of practice, diligence, prudence and competence maintained by prudent mortgage lenders in the jurisdiction where the property is located. Correspondent shall also comply with all of the provisions of the Guide and with all other reasonable requirements and instruction of TMHL. Correspondent shall perform such services at its sole expense except as otherwise expressly provided in the Guide.

Section 7.    <u>Costs and Expenses; Right of Setoff</u>

(a)    The Correspondent shall pay all fees and expenses incurred in connection with the transactions contemplated by this Agreement, including without limitation transfer fees, recording fees, fees for title policy endorsements and continuations, attorneys' fees and costs associated with the physical delivery and insured shipment of the Mortgage Files to TMHL and/or TMHL's document custodian(s).

(b)    TMHL and its successors and assigns shall be entitled to setoff against any amount to be paid by it to the Correspondent for such amounts as may be due from the Correspondent under this Agreement.

Section 8.    <u>No Solicitation Rights</u>

Subject to the provisions set forth in this Section 8, from and after the date hereof, neither the Correspondent, nor any of its Affiliates shall solicit, by means of direct mail, or telephonic or personal solicitation, the Mortgagors of any Eligible Loans for purposes of prepayment of such Eligible Loans. Solicitations undertaken by the Correspondent or any affiliate of the Correspondent that are directed to the general public at large (as opposed to directed specifically at the Mortgagors), including without limitation mass mailings based on commercially acquired mailing lists, the internet and newspaper, radio and television advertisements, shall not constitute solicitation under this Section 8.

5

Section 9.    **Conditions to Purchase**

The obligations of TMHL to purchase any Eligible Loans are subject to the satisfaction prior to or on each applicable Purchase Date (or on such other date as expressly provided for herein) of the following conditions, any one or more of which may be waived in writing by TMHL:

(a)    All of the representations and warranties of the Correspondent set forth in the Guide shall be true and correct as of the applicable Purchase Date, and no event shall have occurred which, with notice or the passage of time, would constitute a Default or breach under this Agreement or under the Guide.

(b)    On each Purchase Date, TMHL shall have received the documents and instruments required to be delivered to TMHL on or before such Purchase Date pursuant to the Guide, duly executed by all signatories other than TMHL as required pursuant to the respective terms thereof.

(c)    All other terms and conditions to be performed on or prior to the applicable Purchase Date (or such other date as expressly provided for herein) by the Correspondent shall have been duly complied with and performed in all respects pursuant to this Agreement.

Section 10.    **Termination or Suspension Upon Default.**

(a)    Upon the occurrence of a Default hereunder or under the Guide, TMHL shall have the right, at its option and in its sole discretion, to suspend the selling privileges of the Correspondent or to terminate this Agreement, in addition to whatever rights TMHL may have at law or in equity to damages, including injunctive relief and specific performance. TMHL shall also have the right to terminate this Agreement without cause by giving thirty (30) days prior written notice to the Correspondent. In the event TMHL terminates this Agreement, the Correspondent shall not be relieved of its other obligations with respect to Eligible Loans previously purchased by the Company including without limitation representations and warranties made herein and in the Guide.  TMHL may terminate this Agreement after a suspension.  A termination of this Agreement or suspension of the selling privileges of the Correspondent due to a Default shall terminate or suspend any outstanding obligations of TMHL to purchase mortgage loans from the Correspondent; provided however, a termination of this Agreement without cause upon the giving of notice as set forth herein shall not terminate any outstanding obligations of TMHL to purchase mortgage loans from the Correspondent.  TMHL may waive any Default, and upon any waiver, such Default shall cease to exist.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereto except to the extent expressly waived.

Section 11.    **Miscellaneous Provisions.**

(a)     Amendment.  Except as provided in Section 4 concerning the Guide, this Agreement may be amended from time to time by the Correspondent and TMHL solely by written agreement signed by the Correspondent and TMHL.

(b)     Governing Law.  This Agreement shall be governed by, construed and interpreted in accordance with the laws of the State of New York.

(c)     Consent to Jurisdiction.  The parties agree that all legal actions and proceedings arising out of or related to this Agreement, or the transactions contemplated hereby, shall be brought in the Federal Court or State Court located in the State of New York, and the parties hereby waive any objections to summons, service of process, jurisdiction over the person or subject matter, or the venue of the courts listed above.

(d)     Reproduction of Documents.  This Agreement and all documents relating hereto, including without limitation (i) consents, waivers, and modifications which may hereafter be executed, (ii) documents received by any party at the closing, and (iii) financial statements, certificates, and other information previously or hereafter furnished, may be reproduced by any photographic, facsimile transmission, photostatic, microfilm, microcard, miniature photographic, or other similar process.  The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile, or further reproduction of such reproduction shall likewise be admissible in evidence.

(e)     Notices.  All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid, or by a nationally recognized overnight courier service, to the following:

If to the Correspondent:

Attention: _____

or such other address as may hereafter be furnished to TMHL in writing by the Correspondent, and

If to TMHL:

~~Thornburg Mortgage Home Loans, Inc.~~
119 East Marcy Street
Santa Fe, NM 87501
Attention: Ron Chicaferro, President

or such other address as may hereafter be furnished to the Correspondent by TMHL in writing.

(f)  Severability of Provisions.  If any one or more of the covenants, agreements, provisions, or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions, or terms shall be deemed severable from the remaining covenants, agreements, provisions, or terms of this Agreement and shall in no way affect the validity or enforceability of the other covenants, agreements, provisions, or terms of this Agreement or the rights of TMHL hereunder.  If the invalidity of any part, provision, representation, or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate in good faith to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

(g)  Counterparts.  This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original, such counterparts, together, shall constitute one and the same agreement.

(h)  Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the Correspondent and TMHL and their respective successors and assigns; provided, however that the Correspondent may not, in whole or in part, assign or otherwise transfer, sell, subcontract, pledge or grant a security interest in any of its rights or delegate any of its duties hereunder to any party, including without limitation Correspondent's affiliates, without the prior written consent of TMHL. Any such purported or attempted transfer without the prior written consent of TMHL shall be null and void. TMHL may sell, assign, convey, hypothecate, pledge or in any way transfer, in whole or in part, without restriction, its rights hereunder, including but not limited to an assignment whereby this Agreement remains in effect between TMHL and the Correspondent as to certain Eligible Loans but is assigned to a third party or parties as to other Eligible Loans.

(i)  Other Agreements Superseded.  This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof.

(j)  No Partnership.  Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto, and at all times the Correspondent shall act and represent itself solely as an independent contractor of TMHL and not an agent of TMHL.

8

(k)     Attorney's Fees.  In the event of a dispute arising from or concerning an obligation Correspondent or TMHL under this Agreement which results in litigation of the issue, the prevailing party to such litigation shall be indemnified by the other party for all costs and expenses in bringing or defending such action.

(l)     Authorized Representatives.  TMHL shall be entitled to rely, without investigation, that any Person holding themselves out to be a representative of the Correspondent for purposes of signing this Agreement or any other document delivered in connection with this Agreement or taking other action pursuant to the Agreement including but not limited to oral discussions was, at the respective times of such signing or actions, a duly elected or appointed, qualified and authorized representative of the Correspondent, and the execution or deliver of the Agreement or any document pursuant to the Agreement and the taking of any other actions, including but not limited to oral discussions, shall be conclusive evidence of such authorization.

IN WITNESS WHEREOF, the Correspondent and TMHL have caused their names to be signed hereto by their respective officers "hereunto duly authorized as of the day and year first above written.

THORNBURG MORTGAGE HOME LOANS, INC.

By: _____

Name: _____ RON CHICAFERRO _____

Title: _____ PRESIDENT _____


[Company] Wall Street Mortgage Bankers Ltd dba Power Express

By: _____

Name: _____ Keith Kantrowitz _____

Title: _____ President _____

EXHIBITS

EXHIBIT A      -      CORRESPONDENT APPLICATION
EXHIBIT B      -      FORM OF OFFICERS' CERTIFICATE
EXHIBIT C      -      FORM OF OPINION OF COUNSEL TO THE COMPANY

EXHIBIT B

## OFFICERS' CERTIFICATE
_June 13th, 2001_

I, _Keith Kantrowitz_, hereby certify to Thornburg Mortgage Home Loans, Inc. (the "TMHL"), that I am the duly elected of (the "Correspondent") and further certify as follows:

Set forth below is a true and correct copy of resolutions authorizing the Correspondent to sell the Eligible Loans subject to the terms of the Correspondent Loan Purchase Agreement between the Correspondent and TMHL (the "Agreement") and the Correspondent Seller Guide, as the case may be:

The Correspondent is hereby authorized to sell mortgage loans to Thornburg Mortgage Home Loans, Inc. ("TMHL") from time to time on a servicing released basis pursuant to the terms of the Correspondent Loan Purchase Agreement (the "Agreement"), all as more fully set forth in the Agreement: and further the president, any vice president, any assistant vice president, secretary or assistant secretary of the Correspondent are hereby authorized in the name of and on behalf of the Correspondent to enter into, execute, deliver and perform under the Agreement, and the execution of the Agreement shall be conclusive evidence that the Agreement is acceptable to and binding on the Correspondent; and further that the president, any vice president, any assistant vice president, secretary or assistant secretary of the Correspondent are authorized to execute and deliver such further certificates, documents, instruments and agreements or take such other actions as are reasonably necessary and appropriate to carry out the foregoing resolutions.

2.   Each of the following persons who, as an officer or representative of the Correspondent, signed the Agreement and any other document delivered in connection with the Agreement, was, at the respective times of such signing and delivery, and is now duly elected or appointed, qualified, and acting as such officer or representative, and the signature of such person, as set forth below opposite his or her name, is his or her genuine signature.

Each person described in Section 11(l) of the Agreement, including but not limited to the following persons, are the Authorized Representatives (as defined in the Guide) of the Correspondent:

| Name | Title | Signature |
|------|-------|-----------|
| Keith Kantrowitz | President | |

EXHIBIT C

FORM OF OPINION OF COUNSEL TO THE CORRESPONDENT

The opinion of counsel to the Correspondent called for by the Agreement shall be dated the Effective Date, shall be addressed to Thornburg Mortgage Home Loans, Inc., shall be satisfactory in form and substance to Thornburg Mortgage Home Loans, Inc. and its counsel, and together with appropriate assumptions and limitations shall be to the effect that:

1.     The Correspondent has been duly organized under the laws of the State of _____ and is validly existing and in good standing under such laws as of the date hereof. The Correspondent has the necessary power and authority and the legal right to own its properties and assets and to transact the business in which it is presently engaged and to own, transfer and convey mortgage loans to TMHL.

2.     The Correspondent has the necessary power and authority and approvals and is duly authorized to execute, deliver and perform the Agreement and all other agreements or instruments contemplated thereby (the "Transfer Documents") to which it is a party and to perform the obligations contemplated thereby.

3.     Neither the execution and delivery of the Transfer Documents to which the Correspondent is a party, nor the consummation of the transactions contemplated by the Transfer Documents, (i) will violate, result in a breach of, constitute a default under or conflict with any law, rule, regulation, judgment, license, order, decree, injunction or permit, or any indenture, loan agreement, mortgage, deed of trust, or other agreement or instrument to which the Correspondent is a party or by which the Correspondent or its assets may be bound or to which the Correspondent may be subject, or (ii) violate any provision of the Correspondent's articles of incorporation or bylaws or (iii) result in the imposition of any lien, charge or encumbrance upon the Correspondent's assets or upon the Eligible Loans. No consent, approval, authorization, license or order of any court, governmental authority or third party is required in connection with the execution and delivery by the Correspondent of the Transfer Documents to which it is a party, or for the consummation of the transactions contemplated thereby.

4.     The Transfer Documents to which the Correspondent is a party have been duly and validly authorized, executed and delivered by the Correspondent and are the legal, valid and binding obligations of the Correspondent, enforceable in accordance with their respective terms except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally and by applicable laws and principles of equity that may affect the availability of remedies (whether such enforcement is considered in a proceeding in equity or at law).

5.    There are no actions, suits or legal, equitable, arbitration or administrative proceedings pending, or threatened or expected, against the Correspondent or any of its officers or directors, which (i) seek to limit, restrict or prevent the consummation of the transactions contemplated in the Transfer Documents, (ii) seek to prevent the sale of the Eligible Loans or the consummation of any of the other transactions contemplated by the Transaction Documents or (iii) either in any one instance or in the aggregate are likely to result in a material adverse change in the business, operations, financial condition, properties, or assets of the Correspondent, or in any material impairment of the right or ability of the Correspondent to carry on its business substantially as now conducted, or in any material liability on the part of the Correspondent.

6.    Immediately upon the transfer and assignment of the Eligible Loans to TMHL by the Correspondent in the manner contemplated in the Correspondent Seller Guide, TMHL shall have good and indefeasible title to, and TMHL shall be the sole owner of, and shall retain all right, title and interest of the Correspondent in and to the Eligible Loans, free and clear of any claim, lien, charge, mortgage, encumbrance or rights of the Correspondent, creditors of the Correspondent or others, subject to the proper recordation of assignments of mortgages securing the Eligible Loans.

7.    The sale of the Eligible Loans as and in the manner contemplated in the Agreement is sufficient fully to transfer to TMHL all right, title and interest of the Correspondent as note holder and mortgagee.





# Seller's Guide

## THORNBURG MORTGAGE HOME LOANS, INC.
## CORRESPONDENT SELLERS GUIDE

**REVISED:  June 5, 2006**

**EFFECTIVE DATE:  July 5, 2006**

Revision date,  June 5, 2006

This Correspondent Sellers Guide is available online at
www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

# 6.1   <u>Representations & Warranties</u>

A.  Correspondent represents and warrants to TMHL that as to each Eligible Loan which is sold to TMHL, as of the subject Closing Date:

1.  The information with respect to such Eligible Loan set forth in the Correspondent Loan Purchase Agreement and in all documents  delivered to TMHL is complete, true, and correct and each Mortgage File contains the items required pursuant to this Correspondent Sellers Guide.

2.  Immediately prior to the transfer thereof to TMHL, the Mortgage and the Mortgage Note are not subject to an assignment or pledge and, immediately prior to the transfer thereof to TMHL, the Correspondent had good and marketable title thereto, and the Correspondent is the sole owner and holder of such Eligible Loan free and clear of any and all liens, claims, encumbrances, participation interests, equities, pledges, charges, or security interests of any nature and has the full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign such Eligible Loan pursuant to this correspondent Sellers Guide and the subject Correspondent Loan Purchase Agreement. Upon the transfer thereof to TMHL,TMHL will have good indefeasible title to, and will be the sole owner of, the Mortgage and the Mortgage Note, free and clear of any and all liens, claims,   encumbrances, participation interests, equities, pledges, charges, or security interests of any nature.

3.  The Mortgage is a valid, subsisting, and enforceable first lien on the Mortgaged Property, including all buildings, fixtures, installations, and improvements to the Mortgaged Property, and the Mortgaged Property is free and clear of all encumbrances and liens having parity with or priority over the first lien of the Mortgage except for liens for current real estate taxes, water, sewer and municipal charges not yet due and payable and special assessments not yet due and payable and security agreements, chattel mortgages, or equivalent documents related to the Mortgage. In addition, the Correspondent has not, and has not caused, and does not intend to place any additional liens against the Mortgaged Property. Each Mortgaged Property is owned by the Mortgagor in fee simple (except with respect to common areas in the case of condominiums, PUDs and *deminimus* PUDs) or by a lease hold for a term at least 5 years longer than the term of the related Mortgage.

4.  The terms of the Mortgage and the Mortgage Note have not been impaired, waived, altered, or modified in any respect, except by a written instrument which has been recorded, if necessary, to protect the interest of TMHL and which has been delivered in accordance with this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement. The substance of any such alteration or modification, to the extent necessary, has been approved by the Primary Mortgage Insurer, if any, and the insurer under the applicable mortgage title insurance policy. As of the Closing Date, the Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the Property has not been released from the lien of the Mortgage, in whole or in part, except with respect to certain releases in part that do not materially affect the value of the Property, nor has any instrument been executed that would effect any such satisfaction, release, cancellation, subordination or rescission.

5.  No instrument of release, waiver, alteration, or modification has been executed in connection with such Eligible Loan, and no Mortgagor has been released, in whole or in part, except in connection with an assumption agreement which has been approved by the Primary Mortgage Insurer, if any, and which is part of the Mortgage File and has been delivered pursuant to this Agreement. The Correspondent has not waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Eligible Loan to be in default nor has the Correspondent waived any default resulting from any action or inaction by the Mortgagor.  Construction-to-perm modifications are acceptable.

6.  There is no default, breach, violation, or event of acceleration existing under the Mortgage Note or related Mortgage and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute such a default, breach, violation, or event of acceleration, and the Correspondent has not waived any such default, breach, violation, or event of acceleration. No litigation or lawsuit related to the Eligible Loan is pending, or to the best of the Correspondent's knowledge, threatened. There are no defaults in complying with the terms of the Mortgage, and all taxes, governmental assessments (including assessments payable in future installments), insurance premiums, water, sewer, and municipal charges, leasehold payments, ground rents and condominium maintenance assessments, which previously became due and owing in respect of or affecting the related Mortgaged Property have been paid, or an escrow of funds has been established in an amount sufficient, or anticipated to be sufficient, to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable. The Correspondent has not advanced funds, or induced, solicited, or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required by the Mortgage or the Mortgage Note.

7.  The first payment due to TMHL on an Eligible Loan will be paid timely, regardless of whether that payment is the borrower's first payment under the Mortgage Note or any subsequent payment thereto.

8.  The Mortgaged Property is free of damage and waste and in good repair, and no hazardous substance (including, without limitation, asbestos and radon exceeding levels permitted by current government regulation) is or has been used or stored or exists in, on, or under the Mortgaged Property, and there is no proceeding pending or threatened for the total or partial condemnation of the Mortgaged Property, nor has any notice of any such pending or threatened proceeding been received or is such a proceeding currently occurring, and the Mortgaged Property is undamaged by fire, earthquake or earth movement, windstorm, flood, tornado, or other casualty, so as to affect adversely the value of the Mortgaged Property as security for such Eligible Loan or the use for which the premises were intended. There is no pending action or proceeding directly involving any Mortgaged Property of which Correspondent is aware in which compliance with any environmental law, rule or regulation is an issue; and to the best of Correspondent's knowledge, nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation.

9.  There are no mechanics' or similar liens or claims which have been filed for work, labor, or material (and no rights are outstanding that under law could give rise to such lien) affecting the Mortgaged Property which are, or may be, liens prior or equal to, or coordinate with, the lien of the related Mortgage and there are no delinquent tax or assessment liens against the Mortgaged Property.

10. All of the improvements which were included for the purpose of determining the appraised value of the Mortgaged Property were completed at the time that such Eligible Loan was originated and lie wholly within the boundaries and building restriction lines of such Mortgaged Property. No improvements on adjoining properties encroach upon the Mortgaged Property. No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation. All inspections, licenses, and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property (including all such improvements which were included for the purpose of determining such appraised value) and, with respect to the use and occupancy of the same, including but not limited to a certificate of occupancy, have been made or obtained from the appropriate authorities and the Mortgaged Property is lawfully occupied under applicable law.

11. There do not exist any circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Mortgagor, or the Mortgagor's credit standing that can be reasonably expected to cause private institutional investors to regard such Eligible Loan as an unacceptable investment, cause such Eligible Loan to become delinquent, or adversely affect the value or marketability of such Eligible Loan.

12. All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were):

   a. in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located and

   b. organized under the laws of such state,

   c. qualified to do business in such state,

   d. federal credit unions, federal savings and loan associations or national banks having principal offices in such state,

   e. not doing business in such state, or

   f. not required to qualify to do business in such state.

13. All payments required to be made for such Eligible Loan under the terms of the Mortgage Note have been made; and no Eligible Loan has ever been delinquent in payment more than 30 days, nor has any payment been made in a calendar month other than the calendar month in which such payment was due (except for monthly principal and interest payments received in the month immediately preceding the month such payment was due).

14. On or prior to the subject Closing Date, the Correspondent has delivered originals or certified true copies of each of the documents with respect to such Eligible Loan. Not later than 90 days after the subject Closing Date, the Correspondent will deliver originals of all such documents not so previously delivered, with evidence of recording thereon. The Correspondent is in possession of a complete Mortgage File with respect to such Eligible Loan containing all of the documents and instruments specified to be included therein, except those documents and instruments delivered on or prior to the subject Closing Date or required to be delivered to TMHL not later than 90 days after the subject Closing Date, and there are no custodial agreements in effect adversely affecting the right or ability of the Correspondent to make the deliveries of such documents. Each of the documents with respect to such Eligible Loan is duly executed, in due and proper form, and in form acceptable to Fannie Mae.

15. The Mortgage Note, Mortgage and other agreements executed in connection there with are original and genuine, and each is the legal, valid, and binding obligation of the maker thereof, enforceable in accordance with its terms, free from defenses, counter claims, offsets or similar disabilities on enforcement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law); and the Correspondent has taken all action necessary to transfer such right of enforce ability to TMHL. All parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties or pursuant to a valid power-of-attorney that has been recorded with the Mortgage.

16. The sale of the Mortgage Note and the Mortgage as and in the manner contemplated by the Eligible Loan Purchase Agreement and this Correspondent Sellers Guide is sufficient fully to transfer to TMHL all right, title, and interest of the Correspondent thereto as note holder and mortgagee. The Mortgage has been duly assigned and the Mortgage Note has been duly endorsed. The Assignment of Mortgage delivered is in recordable form and is acceptable for recording under the laws of the applicable jurisdiction. The endorsement of the Mortgage Note, the delivery to TMHL of the endorsed Mortgage Note and such Assignment of Mortgage, and the delivery of such Assignment of Mortgage for recording to, and the due recording of such Assignment of Mortgage in the appropriate public recording office in the jurisdiction in which the Mortgaged Property is located are sufficient to permit TMHL to avail itself of all protection available under applicable law against the claims of any present or future creditors of the Correspondent, and are sufficient to prevent any other sale, transfer, assignment, pledge, or hypothecation of the Mortgage Note and Mortgage by the Correspondent from being enforceable.

Revision date, June 5, 2006<br>This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.<br>SellersGuide-TMA-CO-M-102606

88

17. Any and all requirements of any law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, or disclosure laws applicable to such Eligible Loan have been complied with, and the Correspondent shall maintain in its possession, available for TMHL's inspection, as appropriate, and shall deliver to TMHL or its designee upon demand evidence of compliance with all such requirements including, but not limited to, the "good-bye letter" required by the real estate settlement and procedures act for servicing released Eligible Loans. The consummation of the transactions contemplated by this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement will not cause the violation of any such laws, and such Eligible Loan does not violate any such law.

18. The proceeds of such Eligible Loan have been fully disbursed, there is no requirement for, and the Correspondent shall not make any, future advances thereunder.  Any future advances made prior to the Closing Date have been consolidated with the principal balance secured by the Mortgage, and such principal balance, as consolidated, bears a single interest rate and single repayment term. There is no obligation on the part of the Correspondent or any other party to make payments in addition to those made by the Mortgagor. The unpaid principal balance as of the Closing Date does not exceed the original principal amount of such Mortgage. Any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefore have been complied with. All costs, fees, and expenses incurred in making, or closing or recording such Eligible Loan have been paid.

19. Such Eligible Loan is covered by an ALTA mortgage title insurance policy or such other generally acceptable form of policy, or insurance acceptable to Fannie Mae (with all applicable endorsements, including without limitation, environmental lien, condominium, adjustable rate Eligible Loan and planned unit development endorsements, to the extent applicable), issued by, and the valid and binding obligation of, a title insurer acceptable to Fannie Mae and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the Correspondent, its successors and assigns, as to the first priority lien of the Mortgage in the original principal amount of such Eligible Loan. Such title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein. The Correspondent or a prior holder of the Mortgage is the sole named insured of such mortgage title insurance policy and the assignment to Purchaser of the Correspondent's interest in such mortgage title insurance policy does not require the consent of or notification to the insurer. Such mortgage title insurance policy is in full force and effect and will be in full force and effect and inure to the benefit of Purchaser upon the consummation of the transactions contemplated by this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement. No claims have been made under such mortgage title insurance policy and no prior holder of the Mortgage, including the Correspondent, has done, by act or omission, anything which would impair the coverage of such mortgage title insurance policy. In lieu thereof such Eligible Loan may be covered by an attorney's opinion of title giving an opinion as to the first priority lien of the Mortgage provided that having such an opinion in lieu of title insurance complied with Fannie Mae requirements at origination.

20. All improvements upon the Mortgaged Property are insured against loss by fire, hazards of extended coverage, and such other hazards as are customary in the area where the Mortgaged Property is located, by an insurer having one of the two highest General Policy Ratings in Best's Key Rating Guide and licensed to do business in the state in which the Mortgaged Property is located. If the Mortgaged Property is located in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available), such Mortgaged Property is covered by flood insurance in accordance with applicable laws, including without limitation the National Flood Insurance Reform Act of 1994. Each individual insurance policy conforms to the requirements of Fannie Mae, is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of TMHL, including any trustee acting on its behalf, upon the consummation of the transactions contemplated by

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

89

this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement and contain a standard Mortgagee clause naming the Correspondent, its successors and assigns, as mortgagee and loss payee. All premiums thereon have been paid. The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor and the Correspondent has not acted or failed to act so as to impair the coverage of any such insurance policy or the validity, binding effect, and enforceability thereof. Each such insurance policy is in an amount not less than the greatest of (i) 100% of the replacement cost of all improvements to the Mortgaged Property, (ii) the outstanding principal balance of the Eligible Loan, or (iii) the amount necessary to avoid the operation of any co-insurance provisions with respect to the Mortgaged Property, and consistent with the amount that would have been required as of the date of origination in accordance with that required by Fannie Mae.

21. Such Eligible Loan, the Mortgage, and the Mortgage Note, including, without limitation, the obligation of the Mortgagor to pay the unpaid principal of and interest on the Mortgage Note, are each not subject to any right of rescission, set-off, counterclaim, or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim, or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim, or defense has been asserted with respect thereto.

22. Such Eligible Loan was originated by a credit union, a savings and loan association, a savings bank, a commercial bank, a similar banking institution which is supervised and examined by a federal or state credit union or banking authority, or is a mortgagee approved by HUD and has not been sold to any Person other than the Correspondent and TMHL, except as evidenced by an Assignment of Mortgage.

23. Unless otherwise set forth, principal payments on such Eligible Loan commenced no more than 60 days after funds were disbursed in connection with such Eligible Loan.

24. If at the time that such Eligible Loan was originated, the Mortgagor represented that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence unless such eligible loan was a second home or investment property and the Correspondent has no reason to believe that such representation of the Mortgagor is no longer true except as set forth on the Correspondent Loan Lock-in Reservation.

25. Except for any Additional Collateral Mortgage Loans, the Mortgage Note is not and has not been secured by any collateral or other security except the lien of the Mortgage.

26. The Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale and (ii) otherwise by judicial foreclosure. The Mortgage contains customary and enforceable provisions for the acceleration of the payment of the unpaid principal balance of such Eligible Loan in the event the related Mortgaged Property is sold or otherwise transferred without the prior consent of the mortgagee thereunder. There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage.

27. In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by TMHL to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

90

28. The Mortgagor owns a fee simple interest in the Mortgaged Property, which consists of a parcel of real property upon which is erected a one- to four-family dwelling, an individual condominium unit, or an individual unit in a planned unit development provided, however, that any condominium unit or planned unit development shall conform with the applicable Fannie Mae, FHA and VA requirements regarding such dwellings, as applicable. Unless otherwise set forth in the Correspondent Lock Reservation, the Mortgaged Property is occupied by and titled in the name of the Mortgagor, who is a natural person, as the Mortgagor's principal place of residence.

29. No action has been taken or omitted, and no event has occurred and no state of facts exists or has existed on or prior to the subject Closing Date (whether or not known to the Correspondent on or prior to such date) which has resulted or will result in an exclusion from, denial of, or defense to coverage under the Primary Mortgage Insurance Policy, if applicable, with respect to such Eligible Loan, including, without limitation, any exclusions, denials, or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured, whether arising out of actions, representations, errors, omissions, negligence, or fraud of the Correspondent, the related Mortgagor, or any party involved in the application for such coverage, including the appraisal, plans and specifications, and other exhibits or documents submitted therewith to the insurer under such insurance policy, if any, or for any other reason under such coverage, but not including the failure of such insurer to pay by reason of such insurer's breach of such insurance policy or such insurer's financial inability to pay.

30. Any escrow agreements with respect to each Eligible Loan comply with applicable law and the related Mortgage Note. There exist no deficiencies with respect to escrow deposits and payments, if such are required, for which customary arrangements for repayment thereof have not been made, and no escrow deposits or payments of other charges or payments due the Correspondent have been capitalized under the Mortgage or the Mortgage Note.

31. No statement, report, or other document with respect to such Eligible Loan contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.

32. The origination, servicing and collection practices with respect to such Eligible Loan have been in all material respects legal, proper, prudent, and customary in the mortgage origination and servicing business.

33. Such Eligible Loan was not selected for inclusion under this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement from the Correspondent's portfolio of comparable loans on any basis which would have a material adverse effect on TMHL.

34. The Mortgagor has executed a statement to the effect that the Mortgagor has received all disclosure materials, if any, required by applicable law with respect to the making of the Eligible Loan. The Correspondent has delivered such statement to TMHL.

35. The appraisal report and the appraiser both satisfy the requirements of Fannie Mae and any applicable requirement of Title XI of the Federal Institutions Reform, Recovery and Enforcement Act of 1989 and the regulations promulgated thereunder, all in effect on the date the Eligible Loan was originated. The appraisal report with respect to the Mortgaged Property was signed prior to the approval of the application for such Eligible Loan by a qualified appraiser, duly appointed by the loan originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of such application.

36. Such Eligible Loan is not being serviced pursuant to any agreement with a third-party servicer or subservicer.

37. Each insurance policy required to be maintained under this correspondent Sellers Guide and the Correspondent Loan Purchase Agreement with respect to such Eligible Loan shall be a valid, binding, enforceable, and subsisting insurance policy of its respective kind and be in full force and effect.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

91

38. No Eligible Loan was made in connection with the construction or rehabilitation of a Mortgaged Property unless the Eligible Loan is a construction-to-permanent mortgage loan which has been fully disbursed, all construction work is complete and a completion certificate/certificate of occupancy has been issued or in connection with facilitating the trade-in or exchange of a Mortgaged Property.

39. The Mortgagor has not notified the Correspondent and the Correspondent has no knowledge of any relief requested or allowed to the Mortgagor under the Soldier's and Sailor's Civil Relief Act of 1940.

40. There has been no fraud, dishonesty, misrepresentation, error, omission, negligence or similar occurrence with respect to such Eligible Loan that has taken place on the part of any Person including without limitation, the Mortgagor, any mortgagee, any appraiser, any builder or developer, or any other party involved in the origination of the Eligible Loan or in connection with the sale of such Eligible Loan. The correspondent has reviewed all of the documents constituting the Mortgage File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.

41. Such Eligible Loan is not subject to any pending bankruptcy, insolvency, reorganization or moratorium.

42. All of the terms of the Mortgage Note pertaining to interest rate adjustments, payment adjustments and adjustments of the outstanding principal balance are enforceable, all such adjustments have been properly made, including the giving of any required notices, and such adjustments do not and will not affect the priority of the Mortgage lien. The Correspondent, in accordance with the applicable law and the requirements of Fannie Mae, has performed an audit of the Eligible Loan to determine whether interest rate adjustments have been made in accordance with the terms of the Mortgage Note and Mortgage. The Correspondent shall hold TMHL harmless and indemnify TMHL against any losses, including attorneys' fees and costs, which result from incorrect calculation or misapplication of any adjustment on any such Eligible Loan prior to the Closing Date, including the reimbursement of interest paid and any fines, penalties and administrative costs that may be incurred as a result of such miscalculation or misapplication of payments.

43. With respect to each Eligible Loan, the Correspondent has performed any and all escrow analysis of the escrow account required by applicable laws and Customary Servicing Procedures. Any and all escrow account adjustments have been performed in accordance with applicable laws and Customary Servicing Procedures. All notices and statements, with respect to any escrow account, required by any such laws and Customary Servicing Procedures have been delivered to the Mortgagor and any other required person.

44. With respect to each MERS Loan, a Mortgage Identification Number has been assigned with respect to such Mortgage Loan, and such Mortgage Identification number is accurately provided on the Mortgage or the Assignment of Mortgage to MERS. The Mortgage or the related Assignment of Mortgage to MERS has been duly and properly registered on the MERS System, and the transfer to TMHL has been properly reflected in the MERS System pursuant to TMHL's registration instructions within 7 days of TMHL's purchase of each MERS Loan. With respect to each MERS Loan, the Correspondent has not received any notice of liens or legal actions with respect to such Mortgage Loan, and no such notices have been electronically posted by MERS.

45. Such Eligible Loan is not classified as (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994, as amended, or (b) a "high cost," "threshold," or "predatory" loan under any other applicable state, federal or local law, (c) a "flipped" loan or loan that does not provide the borrower with a "net tangible benefit" as may be defined under any applicable state, federal or local law.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

92

46. Correspondent has caused to be performed any and all acts required to preserve the rights and remedies of TMHL in any insurance policies applicable to the Eligible Loan including, with out limitation, any necessary notifications of insurers, assignments of policies or interests herein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of TMHL.

47. Such Eligible Loan is not a simple interest Eligible Loan.

48. Correspondent has obtained a life of loan, transferable flood certification contract for such Eligible Loan and shall assign all such contracts to TMHL.

49. No Mortgagor is offered or required to purchase single premium credit insurance in connection with the origination of the related Eligible Loan.

50. The Eligible Loan does not contain provisions pursuant to which monthly payments are paid or partially paid with funds deposited in any separate account established by the Correspondent, the Mortgagor or anyone on behalf of the Mortgagor, or paid by any source other than the Mortgagor nor does it contain any other similar provisions currently in effect which may constitute a "buy down" provision. The Eligible Loan is not a graduated payment mortgage loan and the Eligible Loan does not have a shared appreciation or other contingent interest feature.

51. No Eligible Loan has a Primary Mortgage Insurance Policy that requires the Correspondent or any other party except mortgagor to pay renewal premiums on such policy.

52. With respect to each Trust Loan:
    a. The Mortgagor is a revocable inter vivos living trust that meets the guidelines of and is acceptable to Fannie Mae or other trust approved in writing by TMHL in advance.
    b. The Mortgagor is duly formed and validly existing under the laws of the state of its creation and in any other jurisdiction where the Mortgaged Property is located and has all requisite power and authority to own, lease and operate its properties and carry on its business as now being conducted in the State of its creation and in any other jurisdiction where the Mortgaged Property is located. The trustees acting on behalf of the Mortgagor have been duly authorized to bind the Mortgagor to the Mortgage.
    c. The execution and delivery of the Mortgage and the performance by the Mortgagor of its obligations thereunder (i) are within the trust's powers; (ii) has been duly authorized by all requisite trust action; (iii) will not violate, be in conflict with, result in the breach of, or constitute (with due notice or lapse of time, or both) a default under its trust agreement; and (iv) will not violate, be in conflict with, result in the breach of, or constitute (with due notice or lapse of time, or both) a default under any statute, regulation, rule order or other legal requirements applicable to it, nor to our knowledge, any agreement to which the Mortgagor is bound.

53. With respect to each limited liability company, partnership, or corporation loan:
    a. Mortgagor (i) is a limited liability company, partnership, or corporation, duly organized, validly existing and in good standing under the laws of the State of its formation and is in good standing in any other jurisdiction where the Mortgaged Property is located; and (ii) has all requisite power and authority and all governmental certificates of authority, licenses, permits and qualifications to own, lease and operate its properties and to carry on its business as now being conducted in the State of its formation and in any other jurisdiction where the Mortgaged Property is located. The persons acting on behalf of the Mortgagor have been duly authorized to bind the Mortgagor to the Mortgage.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

93

b.   The execution and delivery of the Mortgage and the performance by the Mortgagor of its obligations thereunder (i) are within its company powers; (ii) has been duly authorized by all requisite company action; (iii) will not violate, be in conflict with, result in the breach of, or constitute (with due notice or lapse of time, or both) a default under any statute, regulation, rule or order or other legal requirements applicable to it, nor to our knowledge, any agreement to which the Mortgagor is bound.

54.   With respect to Eligible Loans for which an "escrow holdback account" has been established:

a.   An appraiser's final inspection report and temporary or final certificate of occupancy have been issued for the mortgaged property and are in the mortgage file;

b.   A valid and enforceable written escrow holdback agreement has been executed by the appropriate parties and is in the mortgage file. The escrow holdback agreement includes, among other things: (i) a specific description of the work to be completed; (ii) a date on which such work must be completed; (iii) provisions for completion of the work and disbursement of escrow funds in the event of noncompletion or dispute among the parties and (iv) a provision that the mortgagee's rights under the escrow holdback agreement, including the mortgagee's rights to the escrow funds, are automatically transferred to any assignee of the escrow hold back loan;

c.   The escrow funds initially retained in connection with  the escrow holdback loan equal at least (i) 125% of the amount estimated by the contractor to  complete the outstanding work if the outstanding work is a single contract item pursuant to a contract separate from the housing contract, or (ii) 150% of the amount estimated the contractor to complete the outstanding work is part of the purchase contract;

d.   The escrow funds and any additional settlement charges required to establish and administer the escrow holdback account are separately identified and itemized on the final HUD-1 Settlement Statement;

e.   The title insurance and mortgage insurance (if applicable) have not been, and shall not be, impaired or adversely affected during the escrow holdback period;

f.   Any and all requirements for completion of the improvements on the mortgaged property shall be satisfied, and all escrow funds shall be fully disbursed, within 90 days after the date on which TMHL purchases the mortgage loan or the mortgage loan was originated;

g.   As of the date of the Certificate of Completion, there shall be no mechanics or similar liens or claims that have been filed for work, labor or material (and no rights are outstanding that under the law could give rise to such liens) affecting the related mortgaged property which are or may be liens prior to, or equal or coordinate with, the lien of the related mortgage; and

h.   No litigation, proceeding, claim, dispute, demand, or investigation is or shall become pending or threatened relating to the escrow holdback agreement, the work to be performed in accordance therewith, the escrow funds or any other matter related thereto.

55. With respect to each Co-op Loan:

a.   A Co-op lien search has been made by a company competent to make the same which company is acceptable to FNMA and qualified to do business in the jurisdiction where the Co-op is located.  A Co-op lien search shall include a search for (i) federal tax liens, mechanics' liens, lis pendens and judgments of record or otherwise against both the Co-op and the seller of the referenced Co-op unit; (ii) filings of Financing Statements; and (iii) the deed of the Co-op project into the Co-op.

b.   (i) The terms of the related Co-op Lease is longer than the terms of the Co-op Loan, (ii) there is no provision in the related Co-op Lease which requires the Mortgagor to offer for sale the Co-op shares owned by such Mortgagor first to the Co-op, (iii) there is no prohibition in the related Co-op Lease against pledging the Co-op shares or assigning the Co-op Lease and (iv) the Recognition Agreement includes provisions which are no less favorable to the lender than those contained in such agreement.

c. Each original UCC financing statement, continuation statement or other governmental filing or recordation necessary to create or preserve the perfection and priority of the first priority lien and security interest in the Co-op shares and Co-op Lease has been timely and properly made. Any security agreement, chattel mortgage or equivalent document related to the Co-op Loan and delivered to the Mortgagor or its designee establishes in the Mortgagor a valid and subsisting perfected first lien on and security interest in the Mortgaged Property described therein, and the Mortgagor has full right to sell and assign the same.

d. The Seller obtained evidence that, if the Co-op building is in a federally designated flood area, a flood insurance policy has been obtained in an amount equal to at least that required by applicable law, which insurance the Co-op is obligated to maintain at the Co-op's cost and expense.

e. Such Co-op Loan is secured by shares held by a "tenant-stockholder" of a corporation that qualifies as a Co-op housing corporation as such terms are defined in Section 216(b)(1) of the Internal Revenue Code of 1986, as amended, and to the best of the Seller's knowledge, no Co-op is subject to proceedings which would, if adversely determined, result in such Co-op losing its status as a Co-op housing corporation under Section 216(b)(1) of the Internal Revenue Code of 1986, as amended.

f. No foreclosure action or private or public sale under the Uniform Commercial Code has ever been threatened or commenced with respect to the Co-op Loan.

g. Each Co-op Security Agreement creates a valid, enforceable and subsisting first security interest in the collateral securing the related Mortgage Note subject only to (i) the lien of the related Co-op for unpaid assessments representing the obligor's pro rata share of the Co-op's payments for its blanket mortgage, current and future real property taxes, insurance premiums, maintenance fees and other assessments to which like collateral is commonly subject and (ii) other matters to which like collateral is commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Co-op Security Agreement; provided, however, that the appurtenant Co-op Lease may be subordinated or otherwise subject to the lien of any mortgage on the Co-op project.

h. All parties to the Co-op Security Agreement had legal capacity to execute and deliver the Co-op Lease, the Stock Power, the Recognition Agreement, the Financing Statement, the Assignment of Proprietary Lease and the Co-op Security Agreement and such documents have been duly and properly executed by such parties; each Stock Power (i) has all signatures guaranteed or (ii) if all signatures are not guaranteed, then such Co-op shares can be transferred by the stock transfer agent of the Co-op if the Seller undertakes to convert the ownership of the collateral securing the related Co-op Loan.

i. There is no default in complying with the terms of the Co-op Security Agreement and the Co-op Lease and all maintenance charges and assessments (including assessments payable in the future installments, which previously became due and owing) have been paid, and the Correspondent has the right under the terms of the Mortgage Note and Recognition Agreement to pay any maintenance charges or assessments owed by the Mortgagor.

56. With respect to each Condominium:

a. In the case of a condominium or unit in a planned unit development ("PUD") project that is not covered by an individual property insurance policy, the condominium or PUD project is covered by a "master" or "blanket" property insurance policy and there exists and is in the Mortgage File a certificate of property insurance showing that the individual unit that secures the first mortgage is covered under such policy.

b. The mortgage title insurance policy covering each unit mortgage in a condominium project related to such Mortgage Loan meets all requirements of FNMA.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

95

    c.  If the residential dwelling on the Mortgaged Property is a condominium unit or a unit in a PUD (other than a de minimis planned unit development) such condominium or PUD project meets the eligibility requirements of FNMA except for the maximum loan amount.

    d.  The Mortgagor owns a fee simple interest in the Mortgaged Property which consists of an individual condominium unit or an individual unit in a planned unit development or a single parcel of real property with a Co-op housing development erected thereon provided, however, that any condominium unit or planned unit development shall conform with the applicable FNMA requirements regarding such dwellings, as applicable.

B.  The Correspondent hereby represents and warrants to TMHL as of the date of execution of the Correspondent Loan Purchase Agreement and each Closing Date as follows:

    1.  The Correspondent is a corporation or limited liability company and is duly organized, validly existing, and in good standing under the laws of the state of its incorporation or formation, and has all licenses and permits necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in the states where the Mortgaged Properties are located if the laws of such states require licensing or qualification in order to conduct business of the type conducted by the Correspondent and to the extent necessary to ensure the enforceability of each Eligible Loan and, to the extent possible, the servicing of each Eligible Loan in accordance with this correspondent Sellers Guide and the Correspondent Loan Purchase Agreement; the Correspondent acquired title to the Eligible Loans in good faith, without notice of any adverse claim; the Correspondent has corporate or limited liability company power and authority to hold each Eligible Loan, to sell each Eligible Loan, and to enter into, execute, and deliver the Correspondent Loan Purchase Agreement, and all documents and instruments executed and delivered pursuant hereto and thereto, and to perform its obligations in accordance therewith and with this Correspondent Sellers Guide; the execution, delivery, and performance of and under this Correspondent Sellers Guide, the correspondent Loan Purchase Agreement, and the Custodial Agreement, if applicable (including all instruments of transfer to be delivered pursuant thereto) by the Correspondent and the consummation of the transactions contemplated thereby have been duly and validly authorized; this Correspondent Sellers Guide, the Correspondent Loan Purchase Agreement, and the Custodial Agreement, if applicable, evidence the valid, binding and enforceable obligations of the Correspondent; and all requisite corporate or limited liability company action has been taken by the Correspondent to make this Correspondent Sellers Guide, the Correspondent Loan Purchase Agreement, and the Custodial Agreement, if applicable, valid and binding upon the Correspondent in accordance with their respective terms.

    2.  No consent, approval, authorization, or order of any court or governmental agency or body relating to the transactions contemplated by this Correspondent Sellers Guide, the Correspondent Loan Purchase Agreement, or the Custodial Agreement, if applicable, including, without limitation, the transfer of legal title to the Eligible Loans to TMHL is required or, if required, such consent, approval, authorization, or order has been or will, prior to the subject Closing Date, be obtained   except for any recordation of Assignments of the Mortgages to and for the benefit of TMHL pursuant to this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement.

    3.  The consummation of the transactions contemplated by this Correspondent Sellers Guide, the Correspondent Loan Purchase Agreement, and the Custodial Agreement, if applicable, are in the ordinary course of business of the Correspondent and will not result in the breach of any term or provision of the charter or by-laws of the Correspondent or result in the breach of any term or provision of, or conflict with or constitute a default under, or result in the acceleration of any obligation under, any agreement, indenture, loan or credit agreement, or other instrument to which the Correspondent or its property is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Correspondent or its property is subject.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

96

4. Neither the Correspondent Loan Purchase Agreement nor any statement, report, or other document furnished or to be furnished pursuant to this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state a fact necessary to make the statements contained herein or therein not misleading.

5. There is no action, suit, proceeding or investigation pending or threatened against the correspondent which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties, or assets of the Correspondent, or in any material impairment of the right or ability of the Correspondent to carry on its business substantially as now conducted, or in any material liability on the part of the correspondent, or which would draw into question the validity of this Correspondent Sellers Guide, the Correspondent Loan Purchase Agreement, the Custodial Agreement, if applicable, or the Eligible Loans or of any action taken or to be taken in connection with the obligations of the Correspondent contemplated herein or therein, or which would be likely to impair materially the ability of the Correspondent to perform its obligations thereunder.

6. The Correspondent does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Correspondent Sellers Guide, the Correspondent Loan Purchase Agreement and the Custodial Agreement, if applicable. The Correspondent is solvent and the sale of the Eligible Loans will not cause the Correspondent to become insolvent. The sale of the Eligible Loans is not undertaken with the intent to hinder, delay or defraud any of the Correspondent's creditors.

7. The Correspondent is an approved seller and/or servicer of conventional Eligible Loans for Fannie Mae in good standing and is a Mortgagee approved by the Secretary of HUD pursuant to Section 203 and 211 of the Act, with facilities, procedures and experienced personnel necessary for the sound servicing of Eligible Loans of the same type as the Eligible Loans. No event has occurred that would render the Correspondent unable to comply with Fannie Mae eligibility requirements.

8. The Correspondent has been advised by its independent certified public accountants that under generally accepted accounting principles the transfer of the Eligible Loans may be treated as a sale on the books and records of the Correspondent and the Correspondent has determined that the disposition of the Eligible Loans pursuant to this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement will be afforded sale treatment for accounting and tax purposes.

9. The Correspondent acknowledges and agrees that the Servicing Fee, if applicable, as calculated at the Servicing Fee Rate, represents reasonable compensation for performing such services and that the entire Servicing Fee shall be treated by the Correspondent for accounting and tax purposes, as compensation for the servicing and administration of the Eligible Loans pursuant to this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement.

10. The transfer, assignment, and conveyance of the Mortgage Notes and the Mortgages by the Correspondent pursuant to this Correspondent Sellers Guide, the Correspondent Loan Purchase Agreement, the Custodial Agreement, if applicable, and the Assignments of Mortgage are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

11. All financial statements pertaining to the Correspondent's last three complete fiscal years, and to any later quarter ended more than sixty (60) days prior to the Closing Date, fairly present the pertinent results of operations and changes in financial position for each of such periods and the financial position at the end of each such period of the Correspondent and its subsidiaries. All such financial statements are true, correct and complete as of their respective dates and have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved, except as may be set forth in the notes thereto. In addition, the Correspondent has delivered information as to its loan gain

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

97

and loss experience in respect of foreclosures and its loan delinquency experience for the immediately preceding three-year period, in each case with respect to all Eligible Loans owned by it and such Eligible Loans serviced for others during such period, and all such information so delivered shall be true and correct in all material respects. There has been no change in the business, operations, financial condition, properties or assets of the Correspondent since the date of the Correspondent's financial statements that would have a material adverse effect on its ability to perform its obligations under this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement. The Correspondent has completed any forms reasonably requested by TMHL in a timely manner and in accordance with the provided instructions.

12. The Correspondent is not operating under any regulatory supervisory agreements and meets all applicable capital requirements set by the federal and/or state governmental agency which has jurisdiction over the Correspondent.

13. The consideration received by the Correspondent upon the sale of the Eligible Loans under this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement constitutes fair consideration and reasonably equivalent value for the Eligible Loans.

14. If the Correspondent is an insured depository institution, the Correspondent makes the following additional representations and warranties:

    a. This Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement conform to all applicable statutory or regulatory requirements. This Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement, as applicable, are:

        (i) executed contemporaneously with the agreement reached by the Correspondent and TMHL,

        (ii) approved by a specific corporate or banking association resolution by the board of directors of the Correspondent, which approval shall be reflected in the minutes of said board, and

        (iii) continuously, from the time of its execution, an official record of the Correspondent.

    b. The Correspondent Loan Purchase Agreement has been duly and validly authorized by a specific corporate or banking association resolution by the unanimous consent of the executive committee of the board of directors of the Correspondent. A copy of such resolution, certified by the corporate secretary of the Correspondent or attested to by a vice president or higher officer of the correspondent has been provided to TMHL.

    c. The Correspondent will maintain a copy of the Correspondent Loan Agreement and shall make same available for TMHL's inspection and copying on five Business Days' notice.

15. As of the subject Closing Date, the Correspondent was the owner of record of each Mortgage and the indebtedness evidenced by each Mortgage Note, except for the Assignment of Mortgage which was sent for recording, and upon recordation the Correspondent will be the owner of record of each Mortgage and the indebtedness evidenced by each Mortgage Note, if applicable, and upon the sale of the Eligible Loans to TMHL, the Correspondent, if servicing the loan for TMHL, retained the Mortgage Files with respect thereto in trust only for the purpose of servicing and supervising the servicing of each Eligible Loan.

16. Prepayment Penalties - If an Eligible Loan provides for a prepayment penalty, such prepayment penalty is enforceable by TMHL and was originated in compliance with all applicable federal, state and local laws. Further, if Correspondent is servicing the loan for TMHL, Correspondent shall enforce TMHL's right to receive such prepayment penalty and shall deliver the prepayment penalty to TMHL as a part of its monthly remittance to TMHL or the Master Servicer, along with reports which document the prepayment penalties collected on a loan-by-loan basis. Upon it request, TMHL shall be entitled to review the books and records of the Correspondent to confirm that all prepayment penalties received with respect to the Eligible Loans have been collected and delivered to TMHL or the Master Servicer.

Revision date, June 5, 2006        98
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

17. The Correspondent shall maintain an Errors and Omissions insurance policy at all times, and annually provide TMHL with a copy of the insurance binder.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

## 6.2   Remedies for Breach of Representations & Warranties

It is understood and agreed that the obligations, representations, warranties and covenants of the Correspondent set forth in this Correspondent Sellers Guide and the Correspondent Loan Purchase Agreement shall survive the execution and delivery of the Correspondent Loan Purchase Agreement and the sale of the Eligible Loans hereunder, and shall inure to the benefit of TMHL, its successors and/or assigns, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination of any Mortgage File. The Correspondent hereby waives the benefit of the applicable statutes of limitations with respect to any of the obligations, representations, warranties and covenants of the Correspondent set forth herein, and it shall not be a defense in any action by TMHL against the Correspondent arising out of a breach of the Correspondent's obligations, warranties, representations or covenants contained herein that TMHL knew or should have known of the existence of the related breach of such obligation, representation, warranty or covenant.

Upon discovery by the Correspondent or TMHL, either (i) of a breach of any of the representations and warranties set forth in the Correspondent Loan Purchase Agreement or (ii) that any document constituting part of any Mortgage File is missing, mutilated, damaged, defaced, incomplete, improperly dated, forged, otherwise physically altered, or otherwise defective in any material respect, the discovering party shall give prompt written notice to the others of such breach or defect. The Correspondent shall use its best efforts to promptly cure in all material respects any such breach or defect within sixty (60) days of the earlier of either discovery by or notice to the Correspondent of such breach or defect, and, if such breach or defect cannot be or is not cured within such 60-day period, the Correspondent shall, at the option of TMHL, except in the case of a breach of a representation and warranty set forth in Section VI of this Correspondent Sellers Guide, repurchase the affected Eligible Loan or in the case of a breach of a representation and warranty set forth in Section VI of this Correspondent Sellers Guide, repurchase either (1) all of the Eligible Loans or (2) such of the Eligible Loans selected by TMHL so that, after such repurchase, such breach or defect is cured in all material respects. Any such repurchase shall be at the Eligible Loan Repurchase Price. If the Correspondent is servicing the Eligible Loan for TMHL, any such repurchase shall be accomplished by the deposit in the Collection Account of the amount of the repurchase price and notice to TMHL. If the Correspondent has sold the Eligible Loan to TMHL servicing released, the Correspondent shall deliver the Eligible Loan Repurchase Price to TMHL by wire transfer of immediately available funds to an account designated by TMHL.

The Correspondent shall pay all costs and expenses incurred in connection with the repurchase of an Eligible Loan, or cure of a breach of a representation or warranty.

In addition to such cure or repurchase obligations of the Correspondent set forth herein, the Correspondent shall indemnify and hold harmless TMHL against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense, or assertion based on or grounded upon, or resulting from a breach of the Correspondent's representations and warranties contained in this Correspondent Sellers Guide or the Correspondent Loan Purchase Agreement. It is understood and agreed that the obligations of the Correspondent set forth herein to cure or repurchase and to indemnify TMHL constitute the sole remedies available to TMHL respecting a breach of the foregoing representations and warranties.

Any cause of action against the Correspondent relating to or arising out of the breach of any representation and warranty made by the Correspondent shall accrue as to any Eligible Loan upon (i) discovery of such breach by TMHL or notice thereof by the Correspondent to TMHL, (ii) failure by the Correspondent to cure such breach or repurchase such Eligible Loan as specified above, and (iii) demand upon the Correspondent by TMHL for all amounts payable in respect of such Eligible Loan.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

100

# 8.1 Defined Terms

**Account Control Agreement:** The account control agreement between the originator and its assignee, the applicable Mortgagor and the applicable securities intermediary granting the originator and its assignee full control of the Pledged Asset Account.

**Additional Collateral Servicing Agreement:** With respect to the Additional Collateral Mortgage Loans, an agreement between the originator and the Correspondent regarding the servicing of the Additional Collateral Mortgage Loan by the originator as the "Servicer" therein, in form and substance acceptable to TMHL in its sole discretion.

**Additional Collateral:** Those marketable assets subject to a security interest pursuant to the Pledge Agreement related to each Pledged Asset Loan, together with Seller's interest in the related Pledge Agreement and the related Control Agreement.

**Agency:** Fannie Mae.

**Agency Eligible Loans:** Eligible Loans that qualify under the rules and regulations of an Agency for sale to such Agency.

**Agency Transfer:** The sale or transfer by TMHL of Agency Eligible Loans to Fannie Mae retaining the Correspondent as "servicer" thereunder.

**Agreement:** The Correspondent Loan Purchase Agreement, including this Correspondent Sellers Guide and all documents in the Correspondent Application Package, and all exhibits thereto, all of which are incorporated in the Agreement by reference and made a part thereof and are an integral part of the Agreement, and all amendments thereof and supplements or addenda thereto.

**Annual Independent Public Accountant's Servicing Report:** A statement from a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to the effect that such firm has, with respect to the Correspondent's overall servicing operations, examined such operations in accordance with the requirements of the Uniform Single Attestation Program for Mortgage Bankers, and such statement indicates the firm's conclusions relating thereto.

**Annual Statement of Compliance:** An officer's certificate stating that (i) the Correspondent has complied in all material respects with the provisions of this Correspondent Sellers Guide, (ii) a review of the activities of the Correspondent during the preceding calendar year has been made under such supervision of the officers signing such officer's certificate, and (iii) to the best of such officer's knowledge based on such review, the Correspondent has fulfilled all its obligations under this Correspondent Sellers Guide throughout such calendar year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof and the action being taken by the Correspondent to cure such default.

**Applicants:** The entities applying to TMHL for approval as a Correspondent pursuant to the terms of this Correspondent Sellers Guide.

**Bailee Letter:** The forms of bailee letter attached hereto as Exhibits G1 and G2.

**Base Pledge Amount:** The percentage of equity required under TMHL's underwriting guidelines multiplied by the property value, minus any down payment or equity.

**Business Day:** Any day that the banks in New York or the state in which the Correspondent's servicing operations are located are open for business to the public except a Saturday, Sunday, or federal holiday.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

104

***Closing Date***:  With respect to each sale and purchase of an Eligible Loan hereunder, the date on which TMHL actually purchases, and the Correspondent actually sells, the Eligible Loan.

***Condo-tel***:  A condominium unit used as a primary or secondary home by a mortgagee, which offers regular maid services, a rental desk and/or a voluntary unit rental pool. Condominium projects with mandatory rental pools or that contain timeshare units are not Condo-tels. TMHL reserves sole discretion in determining whether any particular property qualifies as a Condo-tel.

***Co-op:***  A private, cooperative housing corporation, having only one class of stock outstanding, which owns or leases land and all or part of a building or buildings, including apartments, spaces used for commercial purposes and common areas therein and whose board of directors authorizes the sale of stock and the issuance of a Co-op Lease.

***Co-op Lease:***  With respect to a Co-op Loan, the lease with respect to a dwelling unit occupied by the Mortgagor and relating to the stock allocated to the related dwelling unit.

***Co-op Loan:***  An Eligible Loan secured by the pledge of stock allocated to a dwelling unit in a Co-op and a collateral assignment of the related Co-op Lease.

***Co-op Security Agreement:***  The agreement creating a security interest in the stock allocated to a dwelling unit in the residential cooperative housing corporation that was pledged to secure such Co-op Loan and the related Co-op Lease.

***Condominium:***  A real estate project in which each unit owner has title to a unit in a building, an undivided interest in the common areas of the project, and sometimes the exclusive use of certain limited common areas.

***Corporation Loan:***  An Eligible Loan where title to the Mortgaged Property is vested in a corporation that has been individually approved by TMHL.

***Correspondent:***  The seller of an Eligible Loan to TMHL pursuant to the terms of the Correspondent Loan Purchase Agreement and this Correspondent Sellers Guide. The term "Correspondent," when Eligible Loans are sold servicing retained, shall be deemed to mean "Servicer" as used in the Master Servicer Guide.

***Correspondent Application:***  The application to be completed by an applicant as set forth in this Correspondent Sellers Guide.

***Correspondent Application Package:***  The application package delivered to an applicant which consists of the Correspondent Application and the  correspondent Loan Purchase Agreement.

***Correspondent Loan Purchase Agreement:***  The agreement, which incorporates the terms of this Correspondent Sellers Guide by reference, between the Correspondent and TMHL pursuant to which the Correspondent sells to TMHL, and TMHL purchases from the Correspondent, the Eligible Loans.

***Correspondent Lock Reservation:***  Executed by TMHL and the Correspondent which confirms the locked-in price and rate.

***Correspondent Sellers Guide:***  TMHL Correspondent Sellers Guide in effect on the Effective Date, as amended, modified or restated by TMHL, from time to time, in accordance with Section 4 of the Agreement.

***Debt-to-Income:***  The ratio of the borrower(s) debt to monthly income.

**Default:** Any default under the terms of the Agreement, this Correspondent Sellers Guide or the Master Servicer Guide, as applicable.

**Effective Date:** The date of the Agreement.

**Eligible Assets:** The assets as defined by the Pledge Agreement.

**Eligible Loan:** A mortgage loan which satisfied the criteria set forth in this Correspondent Sellers Guide which TMHL agrees to purchase in accordance with the terms of the Agreement and this Correspondent Sellers Guide.

**Eligible Loan Repurchase Price:** (i) The outstanding principal balance of the Eligible Loan as of the date of repurchase multiplied by the percentage of par paid for such Eligible Loan by TMHL plus (ii) accrued interest on such outstanding principal balance at the Mortgage Loan interest rate from the date to which interest has last been paid and distributed to the Purchaser to the date of repurchase.

**Form of Guaranty:** The form of guaranty delivered by TMHL to an Applicant to be executed by a guarantor(s), as set forth in this Correspondent Sellers Guide.

**Initial Pledge Amount:** The required market value of the Pledged Asset Account as of the date of the Pledge Agreement. For Pledged Asset Accounts that are 100% non-cash equivalent assets, the Initial Pledge Amount equals the Base Pledge Amount times 143%. For Pledged Asset Accounts that are 100% cash equivalent assets, the Initial Pledge Amount equals the Base Pledge Amount. Otherwise, the Initial Pledge Amount equals the Base Pledge Amount minus the value of cash equivalent assets, multiplied by 143%, plus the value of the cash equivalent assets. For example, if the Base Pledge Amount is $100,00 and the borrower is pledging a $50,000 CD, the Initial Pledge Amount equals $121,500 (($100,000 - $50,000) x 143% + $50,000).

**Limited Liability Company or LLC Loan:** An Eligible Loan where title to the Mortgaged Property is vested in a limited liability company that has been individually approved by TMHL.

**Maintenance Pledge Amount:** The minimum market value of the Pledged Asset Account that must be maintained for the term of the Pledge Agreement. For Pledged Asset Accounts that are 100% non-cash equivalent assets, the Maintenance Pledge Amount equals the Base Pledge Amount times 120%. For Pledged Asset Accounts that are 100% cash equivalent assets, the Maintenance Pledge Amount equals the Base Pledge Amount. Otherwise, the Maintenance Pledge Amount equals the Base Pledge Amount minus the value of cash equivalent assets being pledged, multiplied by 120%, plus the value of the cash equivalent assets.

**Master Servicer:** Any master servicer or master servicers retained by TMHL to master service Eligible Loans as designated by TMHL.

**Master Servicer Guide or Master Servicing Guide:** The servicing guide of any Master Servicer retained by TMHL to master service the Eligible Loans, as amended, modified or restated by the Master Servicer from time to time.

**MERS:** Mortgage Electronic Registration Systems, Inc., a Delaware corporation, or any successor in interest thereto.

**MERS Identification Number:** The eighteen digit number permanently assigned to each MERS Loan.

**MERS Loan:** Any Eligible Loan as to which the related Mortgage or Assignment of Mortgage has been registered in the name of MERS as nominee for the holder from time to time of the Mortgage Note and the Correspondent has registered the loan on the MERS system.

**MERS System:** The mortgage electronic registry system maintained by MERS.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

106

*Mortgage:* The mortgage, mortgage deed, deed of trust, or other instrument creating a first lien on or first priority ownership interest in an estate in fee simple in real property securing a Mortgage Note including any assumption agreements or modifications relating thereto; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely accepted practice, the mortgage, mortgage deed, deed of trust or other instrument securing the Mortgage Note may secure and create a first lien upon a leasehold estate of the Mortgagor, if the term of the leasehold estate expires at least ten (10) years after the expiration of the term of the Mortgage.

*Mortgage File:* With respect to any Eligible Loan, a file pertaining to such Eligible Loan that contains the mortgage documents pertaining to such Eligible Loan which are specified in Exhibits B1 and B2 attached hereto and any additional mortgage documents pertaining to such Eligible Loan required to be added to such mortgage file pursuant to this Agreement.

*Mortgage Interest Rate:* As to each Eligible Loan at any time, the annual rate at which interest accrues on such Eligible Loan at such time pursuant to the related Mortgage Note.

*Mortgage Note:* The promissory note or other evidence of the indebtedness of a Mortgagor secured by a mortgage.

*Mortgaged Property:* The real property (or leasehold estate, if applicable) securing repayment of the debt evidenced by a Mortgage Note pursuant to the related Mortgage.

*Mortgagor:* The obligor on a Mortgage Note or a person who has executed a Mortgage.

*Obligor:* The Mortgagor, unless identified as a different person in the Pledge Agreement. The Obligor pledges their security interest in the Pledged Asset Account.

*Opinion of Counsel:* A written opinion of Correspondent's counsel in substantially the form of Exhibit B to the Correspondent Loan Purchase Agreement.

*Officers' Certificate:* Certificates substantially in the form required by the Correspondent Loan Purchase Agreement or in such other form acceptable to TMHL, signed by authorized officers of the Correspondent by any intervening assignments to the last specific assignee thereof and assigned in blank by such last specific assignee.

*Partnership Loan:* An Eligible Loan where title to the Mortgaged Property is vested in a partnership that has been individually approved by TMHL.

*Pledge Agreement:* With respect to each Pledged Asset Loan, the agreement between the Mortgagor and the originator and its assignee and which may also have the applicable securities intermediary as a party thereto, and must have the applicable securities intermediary as a party if such Pledge Agreement incorporates the related Account Control Agreement, granting to the originator and its assignee a security interest in the Additional Collateral as additional security for such Pledged Asset Loan, which may incorporate the related Account Control Agreement, as assigned by any intervening assignments to the last specific assignee thereof and assigned in blank by such last specific assignee.

*Pledged Asset Account:* With respect to each Pledged Asset Loan, the account in which the Additional Collateral is held, control of which is transferred hereunder to TMHL.

*Pledged Asset Loan:* An Eligible Loan secured in part, by a Mortgaged Property and by Additional Collateral pursuant to the Pledge Agreement (also referred to as an Additional Collateral Mortgage Loan).

*Pledged Collateral:* All of the Obligor's right, title and interest in the Pledged Asset Account and all security entitlements therein.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

107

*Primary Wage Earner:* The individual who earns the greater gross monthly income.

*PUD (Planned Unit Development):* A real estate project in which each owner has title to a residential lot and building and a nonexclusive right to use the common areas of the project. The owner may also have a right to exclusive use of certain parts of the common areas.

*Purchase Contract:* The purchase contract pursuant to which a mortgagee purchases a property from the seller of such property.

*Purchase Date:* Each date that the Correspondent sells one or more Eligible Loans to TMHL in accordance with the terms of the Purchase Agreement.

*Purchase Price:* For each Eligible Loan purchased pursuant to the Agreement, an amount determined in accordance with the applicable loan lock confirmation and this Correspondent Seller's Guide.

*Rate Locks:* The interest rate locked in by the Correspondent as set forth in the Correspondent Lock Reservation.

*Regulatory Compliance Laws:* All applicable federal, state and local laws, rules and regulations applicable to the origination and servicing of mortgage loans.

*REMIC:* A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

*Securities Intermediary:* The approved investment broker/dealer responsible for managing the Pledged Asset Account.

*Securitized Loan:* Any Eligible Loan which has been sold or transferred to a trust to be formed as part of, or which has been pledged to a Trustee in connection with, a publicly issued and/or privately placed, rated or unrated, mortgage-backed transaction, in each case retaining the Correspondent as servicer thereunder.

*Servicing Fee:* For all Servicing Retained Sellers, the Servicing Fee on each loan must be at least the minimum required based on the following:

| | |
|---|---|
| Conforming ARM's: | 37.5 bps |
| Non-conforming ARM's: | 25.0 bps |
| Conforming Hybrids: | 25.0 bps, stepping up to 37.5 bps after the first interest adjustment date. |
| Non-conforming Hybrids: | 25.0 bps |

Servicing fees may be higher than these minimums but not lower.

*Third-Party Originations:* An Eligible Loan delivered to TMHL by the Correspondent which was originated by an entity other than the Correspondent.

*TMHL:* Thornburg Mortgage Home Loans, Inc., its successors and/or assigns.

*TMHL Correspondent Program:* The Correspondent program as described in this Correspondent Seller's Guide and the Agreement.

*Transfer Notice:* Any notice given by TMHL to the Correspondent under the terms of the Agreement regarding a sale or transfer of Eligible Loans which will become Securitized Loans, a form of which is attached as Exhibit I hereto.

*Trust Loan:* An Eligible Loan where title to the Mortgaged Property is vested in a revocable inter vivos living trust in accordance with Fannie Mae guidelines or in any other trust that has been individually approved by TMHL.

*Underwriting/Program Guidelines:*   TMHL's underwriting and program guidelines which may be changed, from time to time, by TMHL in its sole discretion.

*Verified Reserves:* All liquid assets plus 70% of verified retirement assets.

*Warehouse Lender:* Any lender providing financing from time to time to TMHL for use by TMHL in the acquisition of Eligible Loans.

Revision date, June 5, 2006
This Correspondent Sellers Guide is available online at www.thornburgcorrespondent.com.
SellersGuide-TMA-CO-M-102606

109



**Thornburg** Mortgage

June 1, 2007

Wall Street Mortgage
Attn: Christine Holman
1111 Marcus Avenue
Lake Success, NY  11042

RE: #0018962696 – Adriana Diaz

Ms. Holman,

The above referenced loan was purchased from Wall Street Mortgage on March 22,
2007.  The first payment due to Thornburg Mortgage is the May 1, 2007 payment.
No payments have been received at Thornburg Mortgage to date.

Thornburg Mortgage requests that Wall Street Mortgage repurchase this loan per the
Correspondent Loan Purchase Agreement, section 3(f): "In the event any borrower
defaults on the payment of the first payment due on an Eligible Loan, Correspondent
shall repurchase such Eligible Loan from TMHL, at TMHL's sole option, pursuant to
the Seller Guide."

We request that you repurchase the loan by July 2, 2007.  Please make arrangement
through me to acquire a payoff statement.

Thank you,

Ricardo Cruz
Servicing Analyst
150 Washington Ave.
Suite 302
Santa Fe, NM 87501
Direct: 505.954.5354
Email: rcruz@thornburgmortgage.com

Thornburg Mortgage, Inc
150 Washington Avenue, Suite 302
Santa Fe, New Mexico 87501
505.989.1900 Tel
505.989.8156 Fax
www.thornburgmortgage.com



**Thornburg** Mortgage

July 03, 2007

Wall Street Mortgage
Attn: Christine Holman
1111 Marcus Avenue
Lake Success, NY 11042

Re: 0018962696 – Adriana Diaz – Second Request

Ms. Holman:

A request was sent on June 1, 2007 for a repurchase request for the above loan due to a
first payment default for this loan.  The first loan payment due to Thornburg Mortgage
was May 1st, 2007 which has not been received to date.  Per our original request, we
required Wall Street Mortgage to repurchase the loan by July 2nd, 2007.

Per the Correspondent Loan Purchase Agreement, section 3 (f); "In the event any
borrower defaults on the payment of the first payment due on an Eligible Loan,
Correspondent shall repurchase such Eligible Loan from THML at THML's sole option,
pursuant to the Seller Guide."

We request that Wall Street Repurchase this request loan by Monday, August 3rd, 2007.
Please see attached payoff statement for payoff figures.

Sincerely,

Ricardo Cruz
Servicing Analyst
150 Washington Avenue Suite 302
Santa Fe, NM 87501
Direct: 505.954.5354
Email: rcruz@thornburgmortgage.com

FROM PAYOFF DEPT                                 (TUE) 7. 3.'07 '14:59 ST. 14:56 NO 4861606029 P

Thornburg Mortgage Asset Corp.
Attn: Payoff Department
425 Phillips Blvd.
Ewing, New Jersey 08618
1-877-270-9295
PAYOFF STATEMENT AS OF July 03, 2007 ("Effective Date")

PREPARATION DATE: July 03, 2007
***NOTE: THIS STATEMENT EXPIRES 30 DAYS AFTER THE PREPARATION DATE***

Adriana Diaz
P O Box 4583
Hialeah FL 33014

Property Address: 1331 Brickell Bay Dr 3605
                  Miami FL 33131

Loan No.: 0018962696                 Original Loan Date: 02-28-07
Original Loan Amount: $ 1,725,000    Loan Type: Conventional
FHA/VA/MI No.:                       Investor No. S43 007 0018962696

Statement forwarded to:
Ricardo Cruz                         Phone Number (000)000-0000
Thornburg Mtg.
Fax 505-954-3854

IMPORTANT:  Your payoff statement contains as many as three sections; each
section may be multiple pages in length.  If you are receiving this payoff
statement via fax, please note that each section may be faxed separately.
The quote to pay off your loan is contained in this first section (up to
three pages in length); payoff instructions and important information are
contained in section two (two pages).  Section three contains all other
information relating to your payoff transaction that is not contained in
the first two sections.  To ensure that your payoff transaction is processed
efficiently, please read the entire payoff statement and follow all
instructions.

ATTENTION BORROWERS USING AUTOMATIC DRAFTING:  Borrowers whose monthly
payments are automatically withdrawn from checking/savings accounts using
our Payment Drafting Program (automatic drafting) must instruct this office
to discontinue automatic drafting at least fifteen (15) business days before
the next scheduled withdrawal by sending a written notice to: Drafting
Department, PO Box 77417, Ewing, NJ 08628.  Failure to comply may result
in continued withdrawals.  Please call 1-877-270-9295 should you have any
questions.

FROM PAYOFF DEPT.                    (TUE) 7. 3'07 14:55 ST. 14:54 NO.4361426929 P  1

Adriana Diaz
0018962696

Statement of amount necessary to pay loan in full on or before 08-03-07.

Interest Rate:  7.25000%              Interest Paid to: 04-01-07

Present Principal Balance: $       1,725,000.00
Interest to 08-03-07:                  42,382.31
Prepayment Charge:                     27,600.00

Subtotal of Amount Secured
by Security Instrument:     $      1,794,982.31

OTHER CHARGES
Accrued Late Charge:                    1,042.18
Unpaid NSF Charges:                        40.00
Recording Fee           :                  10.00
Miscellaneous Fees Due: *                   9.50

Other Charges Sub Total:                1,101.68

Total Due:                  $      1,796,083.99

* Itemization of these amounts is available upon request.  Please call
  1-877-270-9295 to request an itemization.

If funds are received after 08-03-07, include an additional amount of
$ 347.40 per Day.

If the current month's payment or payoff is not received within 15
days of the due date of the next payment, a late charge in the amount
of $ 521.09, in addition to the amount shown above, must be remitted.

If the payoff is transmitted by wire, please add a Wire Processing Fee
of $14.95 to the amounts due.  For wire instructions, see the Loan
Payoff Information Sheet enclosed.

XP731 027 HML PS

FROM PAYOFF DEPT                    (TUE) 7. 3 '07 14:33 ST. 4:36 NO.466/426621 P

To:     Adriana Diaz
        0018962696

## LOAN PAYOFF INFORMATION

### GENERAL INSTRUCTIONS AND CONDITIONS:

* ALL PAYOFF FIGURES PROVIDED ARE SUBJECT TO CLERICAL ERROR CORRECTION AND FINAL AUDIT.
* The borrower must pay all interest that accrues and/or fees that are assessed after the Effective Date.
* In the event a payment reflected in this payoff statement is reversed due to a dishonored or returned check, there will be a charge not to exceed the amount permitted by law.
* Please note that the required payoff amount may change if a payment is returned, or if late charges or escrow advances occur after the Effective Date of this statement.

Since amounts may change, we recommend that you contact our office to verify payoff figures prior to remitting funds.

IF THE LOAN IS DELINQUENT, IN FORECLOSURE OR BANKRUPTCY, this office must be contacted at least 48 hours prior to payoff in order to allow us sufficient time to verify the correct amount necessary to satisfy the loan.

### REMITTANCE OF FUNDS

* Payoff funds in excess of $5,000 must be in the form of a wire, certified funds, cashier's check, money order or an attorney's trust check.
* Funds in the amount of $5,000 or less may be paid by personal check.
* Payoff remittances (wires or checks) received in our office after 2:00 p.m. ET will be processed the following business day.
* Payoff remittances of less than the full payoff amount due will not be applied and interest will continue to accrue until the full amount is received. We will attempt to notify the sender of the amount of the shortage. If the shortage amount is not received within 48 hours of our initial receipt of the funds, the entire remittance may be returned.
* If we must reverse the receipt and application of funds due to an error in the payoff request, a $200.00 handling fee will be assessed.

### PAYMENT BY WIRE:

* Our preferred method of payoff remittance is by wire transfer. A Processing Fee of $14.95 will be charged if you select this method of remittance.
* Funds should be wired to CENLAR FS PRINCEIN, TRENTON, NJ.  ABA No. 231271365/Payoff Bank Acct. Nor. 168002190.
* The wire must include the borrower's name, loan number, and the notation ATTENTION: PAYOFF DEPARTMENT. A contact name and phone number of the originator of the wire should also be included.

FROM PAYOFF DEPT.                                          (TUE) 0. 5'07 14:55'ST. 14:54 NO.446'436021 P  1

Adriana Diaz
0018962696

**PAYMENT BY CHECK:**

* Include the borrower's name and loan number on the check.  Also,
  include a contact name and telephone number.  All checks should be
  made payable to the name appearing on the first page of this
  statement and sent to the following address: Payoff Department, 420
  Phillips Boulevard, Ewing, NJ 08618.

**ESCROW ACCOUNTS:**

* If we escrow funds for payment of charges such as real estate taxes
  and hazard or flood insurance, we will continue to make required
  disbursements from the escrow account for escrowed items until our
  application of the payoff remittance to the borrower's account.
* If an escrow disbursement creates a shortage in the escrow account
  and causes us to advance our funds, the amount of the advance will be
  added to the amount due and must be paid at time of payoff.
* We will attempt to notify the sender of any payoff shortage created by
  escrow disbursements.
* Once a loan is paid in full, no further disbursements will be made for
  escrowed items.  Following payoff, we will conduct a final review of
  the escrow account.  You will be notified if additional funds are due,
  otherwise any excess funds will be returned.

**LATE CHARGES:**

* Until a loan is paid in full, late charges will continue to accrue as
  permitted by law for any monthly payment that is due but not
  received by the late charge assessment date.

**ADDITIONAL PAYOFF STATEMENTS:**

* We will charge a fee, as permitted by law, for each additional payoff
  statement generated or for priority delivery of each statement.  The
  amount of the fee varies by state and by loan type.  Please contact us
  for the amount of the fee.

**MAILING ADDRESS CHANGE:**  Please provide the mailing address to which
original loan documents and any escrow refund should be returned.

**DOCUMENT CANCELLATION:**

* Satisfaction documents will be sent directly to the recording office
  for cancellation or reconveyance.

XP732 005 HML PS



**Pepper Hamilton LLP**
A Pennsylvania Limited Liability Partnership

Suite 400
301 Carnegie Center
Princeton, NJ 08543-5276
609.452.0808
Fax 609.452.1147

Daniel G. Murray
609.951.4202
murrayd@pepperlaw.com

Dennis R. Casale
Michael J. Mann
Partners-in-Charge, Princeton Office

June 9, 2008

## BY E-MAIL & FEDERAL EXPRESS

Mr. Keith Kantrowitz
Wall Street Mortgage Bankers, Ltd.
1111 Marcus Avenue
Lake Success, NY 11042

Allen Perlstein, Esq.
Silverman Perlstein & Acampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753

Re:    Ms. Adriana Diaz
Loan No. 0018962696

Gentlemen:

      This firm represents Thornburg Mortgage Home Loans, Inc. ("Thornburg") regarding the referenced loan (the "Loan"). As you are aware, Ms. Diaz failed to make the first payment on the Loan due May 1, 2007. Pursuant to Section 3(f) of the Correspondent Loan Purchase Agreement (the "CLPA") dated as of June 13, 2001 between Thornburg and Wall Street Mortgage Bankers, Ltd. d/b/a Power Express ("Wall Street"), Wall Street is contractually obligated to repurchase the Loan from Thornburg. Thornburg previously made a repurchase request on June 1, 2007 and Wall Street failed to make such repurchase. Thornburg hereby demands that Wall Street repurchase the Loan immediately.

      In addition to the first payment default, Thornburg previously notified Wall Street of additional breaches of representations and warranties related to the Loan. In Allen Perlstein, Esq.'s July 24, 2007 letter addressed to Attorneys Title Insurance Fund, Inc. (the "Letter"), Wall Street made a claim against Attorney Title Insurance Funds, Inc., citing that its agent, National Title Services, Inc., failed to comply with Wall Street's written closing instructions relating to the enforceability and priority of the lien of the mortgage, or acted with fraud or dishonesty in the handling of Wall Street's funds and documents. The Letter also states vesting of the mortgaged property in Ms. Diaz's name never occurred and the property was subsequently sold to a third party. The information provided by Wall Street in the Letter confirms the violation of a number of representations made by Wall Street to Thornburg in the Thornburg Correspondent

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
| --- | --- | --- | --- | --- | --- |
| | Berwyn | Harrisburg | Orange County | Princeton | Wilmington |

49702579 v1

www.pepperlaw.com

**Pepper Hamilton LLP**
Attorneys at Law

Sellers Guide related to the Loan, including: Section 6.1(a)(3) (mortgage is valid, subsisting, and enforceable first lien); Section 6.1(a)(6) (no default, breach, violation, or event of acceleration existing under the mortgage note or related mortgage); Section 6.1(a)(18) (title insurance policy ensures a first priority lien of the mortgage); and Section 6.1(a)(38) (there has been no fraud, dishonesty, misrepresentation, error, omission, negligence or similar occurrence with respect to the mortgage loan). Section 6.1(a) of the Correspondent Sellers Guide is incorporated into the CLPA by reference.

Section 6.2 of the Correspondent Sellers Guide requires Wall Street to repurchase the Loan from Thornburg based on the breaches of representations and warranties set forth above. Wall Street is also obligated to indemnify Thornburg for any losses, damages, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments and other costs, and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from breach of the Correspondent's representations and warranties contained in the Correspondent Sellers Guide.

Please make arrangements with Thornburg to immediately repurchase the Loan no later than July 3, 2008. The total amount due is $1,851,952.82, made up of $1,806,399.32 for the outstanding amount due on the loan, $43,470.00 for repayment of the loan premium paid to Wall Street and $2,083.50 for legal fees incurred by Thornburg.

In the event Wall Street fails to repurchase the Loan from Thornburg by July 3, 2008, Thornburg will take any and all actions necessary to enforce its rights, including instituting a lawsuit. In such event, Thornburg is entitled to obtain from Wall Street all costs and expenses, including legal fees, related to enforcing its rights for repurchase and indemnification.

If you have any questions concerning this matter, please do not hesitate to contact me.

Sincerely,

Daniel G. Murray

DGM/lp
cc:   Scott Turlington